**H. SAND & CO., INC., Plaintiff,**

v.

**AIRTEMP CORPORATION, Defendant.**

**No. 83 Civ. 5722 (IBC).**

United States District Court,
S.D.N.Y.

May 30, 1990.

---

Berman, Paley, Goldstein & Berman, New York City (Stuart J. Moskovitz, of counsel), for plaintiff.

Weisman, Celler, Spett & Modlin, New York City (John B. Sherman, of counsel), for defendant.

## OPINION

IRVING BEN COOPER, District Judge.

### RELIEF SOUGHT

Defendant Airtemp Corporation ("Airtemp") moves for summary judgment pursuant to Fed.R.Civ.P. 56(b) dismissing the amended complaint of plaintiff H. Sand & Co. Inc. (Sand) on the grounds that: (a) plaintiff Sand did not initiate litigation until more than four years after tender of delivery of the goods and thus, under New York Uniform Commercial Code (U.C.C.) § 2–725 this action is time–barred; (b) Sand expressly assented to Airtemp's warranty terms in writing which expired long before Sand made any claim for service thereunder; or (c) since Sand's and Airtemp's terms and conditions of sale are conflicting regarding the sale of the goods, under U.C.C. § 2–207, neither parties' terms apply; instead, the implied warranties of U.C.C. §§ 2–314 and 2–315 are imposed by operation of law. Defendant also contends that even if Sand's warranty is applicable, it had expired by the time plaintiff requested service from Airtemp because service was requested more than "one year from acceptance by owner" (the terms contained within Sand's purchase order).

Plaintiff opposes defendant's motion for summary judgment and moves for partial summary judgment pursuant to Fed.R. Civ.P. 56(a), maintaining that plaintiff's terms and conditions of sale, which contain its warranty, are the only terms and conditions which have been exchanged between the parties in this sale, and "no applicable limitation of liability exists which would restrict recovery to the terms of defendant's alleged 'standard warranty'." (Plaintiff's Notice of Motion, filed August 24, 1988). Alternatively, even if there are conflicting terms and conditions of sale between the parties and a "battle of the forms" situation exists, the limitations imposed by defendant's warranty would not apply.

### STATEMENT OF FACTS

As part of a series of major improvements to its facilities in the metropolitan area, the Port Authority of New York and New Jersey ("Port Authority") undertook the renovation of its main Bus Terminal located at 8th Avenue and 40th Street in Manhattan, New York. Carlin Atlas was retained by Port Authority as the general contractor for the renovation project and in turn hired plaintiff Sand, a heating, ventilation and air conditioning subcontractor.

On or about June 6, 1977, Sand ordered from defendant Airtemp, an air conditioning manufacturer, four motor driven hermetic centrifugal chillers, including accessories, for installation in the Port Authority Bus Terminal. Sand submitted a purchase order containing its terms and conditions of sale through Airtemp's sales representative, Charles J. Duwe Sales, Inc. Air-

temp's receipt of the purchase order on June 13, 1977 is indicated by stamp on its face.

Customary to its policy and practice, Airtemp claims to have forwarded its terms and conditions of sale to Sand by way of an order acknowledgment form. Despite Airtemp's claim, Sand denies ever receiving the order confirmation form containing said terms and conditions. Strikingly, no physical record of an order acknowledgment form with regard to this particular sale exists. The only evidence before this court regarding the alleged procedure is a sworn affidavit of Fred Hagee, president of Airtemp at the time of the sale; the deposition of an employee, E. Duane Lynn, and the claimed reverse side of an acknowledgment form containing Airtemp's terms and conditions of sale.

The Hagee affidavit merely states "[I]t was Airtemp's policy and procedure to automatically send to each prospective customer a printed form containing Airtemp's terms and conditions of sale." (Hagee Affidavit, sworn to August 11, 1988). E. Duane Lynn, Director of Service at Airtemp at the time of this transaction, testified as follows:

"Q. ... Can you state that under oath, that that was in fact what occurred in 1977 as a matter of course?

A. To my knowledge, all orders received were placed into a computer, and the computer generated a packet of papers which contained various amounts of information,....One of those packets was an acknowledgement, one portion of that packet was an order acknowledgement, which on the reverse side of that acknowledgement carried all the terms and conditions of sale.

You can go through the files and you will see all the other papers that were part of that packet, orders in the files—

Q. Have you ever seen that in the files, maybe not on this job, but on other jobs for 1977?

A. Not the order acknowledgement portion of it, because that would be sent to the customer—

Q. So you never have seen—....

A. But the other papers are in the files that belong in the files, otherwise there may be nine or ten sheets. One may be an order acknowledgement, one may be going to production, one may go to inventory control, et cetera. They would be there. But the order acknowledgment would not be there, because that would be forwarded to the customer...."

(Lynn Deposition, sworn to March 1, 1984 at p. 20).

### Manufacture and Delivery of the Chillers

The four chillers were manufactured by Airtemp at its plant in Bowling Green, Kentucky. Chillers # 1, # 2 and # 3 were tested during the week of January 3, 1978. Chiller # 4 was not tested at Airtemp's Bowling Green plant because the company was in the process of relocating its plant to Edison, New Jersey, and the fourth unit was finished after the Bowling Green test stand had been disconnected. All four chillers were shipped to Sand's agent, Associated Rigging and Hauling Corporation ("Associated") between January 31 and March 31, 1978.[1]

In November 1978, once the Edison test stand was assembled, arrangements were made to ship chiller # 4 from Associated to Airtemp's Edison plant; the fourth chiller was tested there in December 1978 with Port Authority witnesses and returned in January 1979.

### Project Delays and Notice of Defect

The Port Authority/Carlin Atlas renovation project fell far behind schedule and the installation and start up of the chillers was significantly delayed as a result.[2] As early

---

1. The exact shipping dates are as follows: Chillers # 1 and # 2–January 31, 1978; Chiller # 3–March 28, 1978; and Chiller # 4–March 31, 1978.

2. Among the numerous problems that caused these delays were a lack of necessary concrete work (pads for the units), labor problems and lack of sufficient electrical voltage required to run the units. These delays placed additional

as April 1978 Sand began to complain to Carlin Atlas about the delays and the resulting costs. The delays continued and Sand continued to protest in writing to Carlin Atlas. The original projected completion date for the machines was between July and October 1978; however, the delays continued and the chillers were not actually started up until 1980.

Plaintiff claims that upon start up, in May 1980, it discovered for the first time that the chillers did not function properly and immediately notified defendant.[3] Defendant refused to perform any work on the chillers without additional payment. Hence, plaintiff performed the necessary repairs on its own and now seeks over one million dollars in damages as a result of defendant's refusal to honor the alleged governing warranty.

In support of its claims, plaintiff alleges that plans and specifications for the manufacture of the chillers were forwarded to defendant by Port Authority. According to plaintiff, this "required Airtemp to provide the chillers with certain performance capabilities, including 1800 GPM capacity for chilled water, 2620 GPM capacity for condenser water as well as numerous other requirements which could only be determined after installation...." (Joint Pre–Trial Order, at 5). In addition, Airtemp was required to provide "trained representatives for a period of three days per machine to assist in the start up of each of the chillers[,]" (Id. at 6) and "certain testing [was] to be performed by Airtemp subsequent to installation of the chillers." (Id. at 5–6). The Port Authority plans and specifications have not been submitted to this court.

Originally, Sand brought an action against Airtemp's then parent, Fedders Corporation, on December 16, 1982. The parties stipulated that Sand would discontinue that action and, for statute of limitation purposes, any action by Sand against

Airtemp would be deemed to have been started on the date the Fedders lawsuit was filed.

### The Conflicting Warranties

The purchase order Sand submitted to Airtemp contains information particular to this sale. It reads in pertinent part:

> "You are to furnish four (4) Chrysler Air Temp Motor Drives, Hermetic centrifugal chillers including all accessories service complete all as per plans and specifications for the above job.... All material subject to inspection at the time of manufacture. Notify ... the Port Authority of New York & New Jersey ... when and where shipment is made...."

(Sherman Affidavit Ex. C).

Pre-printed on the bottom left portion of the form is standard language applicable to all Sand purchases:

> This order shall not be binding until acceptance and return, within five days, of the signed acknowledgement copy specifying the shipping date. Such acceptance is subject to the TERMS AND CONDITIONS STATED ON THE FACE AND REVERSE SIDE OF ORIGINAL AND ACKNOWLEDGEMENT COPIES HEREOF, which seller agrees shall constitute the final and complete agreement between Purchaser and Seller. Any modification or recission [sic] of this agreement shall be ineffective unless in writing and signed by both Purchaser and Seller.

(Id.).

The reverse side of the purchase order contains plaintiff's pre-printed "general conditions and instructions," including its warranty which states:

> All material and/or equipment furnished under this order shall be guaranteed by the Seller against defects and Seller agrees to replace without charge to Purchaser said material and equipment, or remedy any defects, latent or patent, not

---

financial demands upon Sand, which they planned to pass along to Carlin Atlas.

**3.** While the record is bare with regard to the exact date defendant was first notified of the defects, both parties agree that "after the start-

up plaintiff notified defendant that repairs were necessary and plaintiff asked defendant to perform such repairs." (Joint Pre–Trial Order at 3) (hereafter, "JPTO").

due to ordinary wear and tear, or not due to improper use or maintenance, which defects may develop within one year from date of acceptance by Owner, or within the guarantee period set forth in applicable plans and specifications, whichever period is longer.

(*Id.*).

The terms and conditions also set forth that "... Seller shall pay to Purchaser all consequential loss or damage resulting therefrom." (*Id.*). Additionally, "The material or apparatus to be supplied against this Purchase Order shall, at Purchaser's option, be subjected to inspection and test at the maker's works[,]" and "All material and equipment furnished hereunder shall be in strict accordance with plans specifications and general conditions applicable to the contract of Purchaser with the Owner ..., and Seller shall be bound thereby in the furnishing of material and equipment under this Purchase Order." (*Id.*).

Airtemp submitted a sample photocopy of its standard terms and conditions of sale to the court which it claims is located on the reverse side of all Airtemp order acknowledgement forms and automatically mailed to each prospective customer. Defendant, however, has not submitted a sample of the front side, *i.e.*, an actual order acknowledgement, for *this* or *any* transaction.

Defendant's terms and conditions differ substantially from those of plaintiff. Specifically, the warranty reads as follows:

"Airtemp warrants to direct purchasers from it the Applied Machinery & Systems air conditioning products manufactured by it to be free of defects in workmanship and material under normal use service and for a period of 12 months from start-up or 18 months from date of original shipment, whichever occurs first. Airtemp's obligation under this warranty is limited solely to repairing or replacing parts, f.o.b., which in its judgment are so defective and are returned prepaid to its plant or other designated point.... No claim under this warranty will be honored if the equipment covered has been misused, neglected, damaged in transit or tampered with or changed in any way and in no event shall Airtemp be liable for special or consequential damages. THIS WARRANTY IS THE ONLY WARRANTY APPLICABLE TO APPLIED MACHINERY AND SYSTEMS EQUIPMENT MANUFACTURED OR SOLD BY AIRTEMP AND IS MADE EXPRESSLY IN LIEU OF ANY WARRANTIES OTHERWISE IMPLIED BY LAW, INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. THE REMEDIES UNDER THIS WARRANTY SHALL BE THE ONLY REMEDIES AVAILABLE TO THE PURCHASER OF THE EQUIPMENT OR ANY OTHER PERSON AND NEITHER AIRTEMP NOR THE AUTHORIZED MANUFACTURERS' REPRESENTATIVE ASSUMES ANY OTHER OBLIGATION OR RESPONSIBILITY WITH RESPECT TO THE CONDITION OF THE EQUIPMENT AND NEITHER ASSUMES NOR AUTHORIZES ANYONE TO ASSUME FOR ANY OF THEM ANY ADDITIONAL LIABILITY."

(Sherman Affidavit Ex. E).

Perhaps the most glaring difference between the two warranties is differing time periods each covers. Plaintiff's warranty runs "one year from date of acceptance by Owner, or within the guarantee period set forth in applicable plans and specifications [not provided to the court], whichever period is longer." (Sherman Affidavit Ex. C). Defendant's warranty runs "for a period of 12 months from start-up or 18 months from date of original shipment, whichever occurs first." (Sherman Affidavit Ex. E).

The warranties also differ with respect to the extent of their coverage. In particular, plaintiff's warranty is for repair and/or replacement and extends to consequential damages ("In the event the equipment does not meet the foregoing requirements Seller shall immediately on notice replace same, or remedy any deficiency, without expense to the Purchaser; and further, Seller shall pay to Purchaser all consequential loss or damage resulting therefrom.") (Sherman

Affidavit Ex. C.). While defendant's warranty is also limited to a repair and replacement guarantee, it excludes itself from any liability for consequential damages. (Sherman Affidavit Ex. E).

Both documents state that the sale was conditioned on the acceptance of their respective terms and stipulate that any changes or alterations to their agreement must be in writing. There is no evidence that the parties altered either of these documents. Further, there is no evidence that the Sand purchase order was accepted by a signature on the form returned to plaintiff (as required by its own terms) or that there was an acceptance of the acknowledgement allegedly sent by Airtemp to Sand.

## DISCUSSION

### I. Statute of Limitations

Before examining the parties' claims with respect to the conflicting warranty terms, as a threshold matter we must address defendant's assertion that plaintiff's action is time-barred by the statute of limitations.

■ The dispute before us involves the sale of goods (hermetic centrifugal chillers); thus, U.C.C.'s Article 2 supplies the governing limitation period. N.Y.U.C.C.Law § 2–102 (McKinney 1964). *See also Uchitel v. F.R. Tripler & Co.*, 107 Misc.2d 310, 312, 434 N.Y.S.2d 77, 79 (App.Term, 1st Dept.1980).

In pertinent part, the U.C.C. provides: 1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of

action accrues when the breach is or should have been discovered....

N.Y.U.C.C.Law § 2–725 (McKinney 1964).

Thus, under the U.C.C., "any action for breach of a contract for sale, including an action based on breach of warranty, must be brought within four years of date of delivery unless the warranty explicitly extends to future performance." *Stumler v. Ferry–Morse Seed Co.*, 644 F.2d 667, 673 (7th Cir.1981). *See also City of New York v. Pullman Inc.*, 662 F.2d 910, 919 (2d Cir.1981), *cert. denied sub nom. Rockwell Int'l Corp. v. City of New York*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1454 (S.D.N.Y.1986); *City of Cincinnati v. Dorr–Oliver, Inc.*, 659 F.Supp. 259, 261 (D.Conn.1986); *Holdridge v. Heyer–Schulte Corp. of Santa Barbara*, 440 F.Supp. 1088, 1101 (N.D.N.Y.1977).

In its attempt to survive a statute of limitations dismissal, plaintiff maintains that "tender of delivery" did not occur when physical possession of the chillers was transferred from Airtemp to Sand's agent, between January and March 1978, but rather occurred, at the earliest, in January 1979—once chiller # 4 was tested and returned. Alternatively, plaintiff maintains that the Port Authority plans and specifications required certain testing and service of the equipment subsequent to installation of the chillers and "until these conditions were met (and they never were) 'delivery' could not have been completed, by definition." (Sand Memorandum in Support of Motion for Partial Summary Judgment at 6.) Finally, plaintiff asserts that the statute of limitations did not expire because the warranty extends to future performance.

Sand's first contention is based upon the undisputed fact that the four chillers were shipped to its agent Associated between January and March 1978, yet chiller # 4 was returned to Airtemp in November 1978 because defendant did not conduct a test run of the chiller prior to shipping it. Chiller # 4 was shipped to Sand in January 1979 after it was tested. Thus, plaintiff

avers, "tender of delivery" occurred in January 1979. As a result, Sand's cause of action would be saved since it initiated litigation in December 1982, which falls within the four year statute of limitation imposed by the U.C.C.

Under Sand's theory, the goods were not "tendered" until all four chillers satisfied the required testing. Although plaintiff does not rely on any contractual language to support this argument, we look to the only source available to the court for which to base this claim. Plaintiff's purchase order provides "[a]ll material subject to inspection at time of manufacture" and "[t]he material or apparatus to be supplied against this Purchase Order shall, at the Purchaser's option, be subjected to inspection and test at the maker's works." (Exhibit C).

"Tender of delivery" has been defined in U.C.C. section 2–503, which states in part: "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition ..." N.Y.U.C.C.Law § 2–503 (McKinney 1964). Despite the language "conforming goods," the term has been used to refer to goods offered in fulfillment of a contract *even* if there is a defect when the goods are measured against the specific contract obligations. Thus, even delivery of non-conforming goods may constitute tender of delivery. *Standard Alliance Indus., Inc. v. Black Clawson Co.,* 587 F.2d 813, 819 (6th Cir. 1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Long Island Lighting Co.,* 646 F.Supp. at 1455; *Ontario Hydro v. Zallea Systems, Inc.,* 569 F.Supp. 1261, 1267 (D.Del.1983); *Uchitel,* 107 Misc.2d at 314, 434 N.Y.S.2d at 80.

If we were to apply § 2–503 literally "until the seller tenders conforming goods, the limitation period provided in § 2–725 would never apply. This would circumvent the very purpose of § 2–725, which ... is to provide a finite period in time when the seller knows that he is relieved from liability for a possible breach of contract for sale or breach of warranty." *Ontario,* 569 F.Supp. at 1267. "To argue that in a breach of warranty action accrual does not occur until a proper tender is made, would be to substitute in place of section 2–725's four year limitation period a statute of non-limitation and allow the buyer a perpetuity in which to bring suit. We therefore believe that a tender of non-conforming goods starts the four year breach of warranty period running." *Uchitel,* 107 Misc.2d 310, 314, 434 N.Y.S.2d 77, 80.

Even when we consider the fact that chiller # 4 was tested at a later date in the transaction than the other three, we are not precluded from finding that tender of delivery occurred when all four chillers were shipped to Sand's agent during January to March, 1978.[4]

Plaintiff relies heavily on *City of New York v. Pullman Inc., supra,* to support its argument that tender of delivery could not have occurred until after inspection requirements were met. In *Pullman,* the City of New York contracted to buy 754 R–46 subway cars. Pursuant to the contract, a sampling of 10 subway cars were delivered for a 30 day on–line test to determine whether the cars conformed with the requirements of the contract. *Pullman,* 662 F.2d 910. The court in *Pullman* found that the delivery of the ten subway cars for testing was not "tender of delivery", but rather a fulfillment of a contract requirement. The court held that tender of delivery occurred after completion of the on-line testing, when delivery of the remaining cars began. *Id.* at 919.

We are ever so mindful that the *Pullman* holding is based upon a rare and distinctive set of facts and thus we must be restrictive in our application of its rulings. As the court in *Ontario Hydro v. Zallea Systems, Inc.* stressed: "... [Pullman]

---

**4.** Plaintiff mentions briefly in its papers that the purchase "order clearly indicates that a *system* is being purchased consisting not only of four chillers, but the *accessories,....*" (emphasis added). We find even if certain accessories were not delivered with the chillers by March 1978, plaintiff has failed to establish that these accessories are nothing more than incidental to the principal contract for hermetic centrifugal chillers. The law is clear that non-conforming tender may constitute tender of delivery.

should not be applied liberally to all breach of warranty cases." *Ontario,* 569 F.Supp. 1261, 1267. Moreover, we find enough distinctions between *Pullman* and the case at bar to warrant different results.

The *Pullman* case presented a unique factual situation in which the parties had agreed to a 30 day on-line inspection period. The inspection involved only a small percentage (2%) of the total goods. Once the inspection period was over and delivery of the goods began, the statute of limitations accrued. *Pullman,* 662 F.2d at 919. Hence, the clause in *Pullman* has been construed as a "pre-delivery inspection" clause. *Ontario,* 569 F.Supp. at 1268.

Moreover, it is important to note that the Second Circuit's holding in *Pullman* was based upon its finding that "[t]he contract specifications provided that the [subway car] design would be required to pass a 30 day on-line inspection before it would 'conform' to the contract requirements." *Pullman,* 662 F.2d 910, 919. The court stressed:

"Until that inspection occurred, therefore, there could be no tender of 'conforming goods' within the meaning of § 2–503(1). *Moreover, under the contract [the buyer was] ... not obliged to take any steps until [the seller] conformed to the specifications by delivering cars which had completed the 30 day test, since the contract **specifically** provided that any cars built before the 30 day test was completed were constructed at the seller's risk."*

*Id.* (emphasis added). That is, "... the [Pullman] inspection test was to be conducted not only before the vast balance of the goods were delivered but it was designed to determine whether the balance of the goods should in fact be delivered." *City of Cincinnati,* 659 F.Supp. 259, 264.

In contrast, in the case at bar the contract does not provide for a finite period of

inspection nor does it spell out specific testing measures. The inspection clause is unclear and ambiguous as to whether the parties agreed that inspection or testing at time of manufacture constituted a condition precedent to the delivery of the chillers.[5]

Our finding that the inspection provision contained in Sand's purchase order does not postpone tender of delivery (unlike the finding in *Pullman*) is further supported by several cases in which courts have also found *Pullman* distinguishable. In our opinion, the facts of these cases are far more similar to *Pullman* than the facts of the instant case, thus strengthening the basis for our conclusion.

In *City of Cincinnati v. Dorr–Oliver, supra,* the parties signed a sales contract requiring extensive testing of goods before and after the buyer obtained possession of them. In fact, they provided for three levels of testing for the equipment:

"There was to be, *first,* a shop test for each of the 16 centrifuges to be delivered. The completely assembled centrifuge was to be *tested at the defendant's manufacturing plant and was to be witnessed by a Registered Professional Engineer ....No centrifuge was to be shipped to the plaintiff until the witnessing engineer had approved the shop test reports.* The *second test* was to be a simulated performance test.... at a wastewater treatment plant of the defendant's choice....The test was to be *conducted on only one centrifuge....* If the equipment failed initially, the test could be performed again. If the equipment failed a third time, the *plaintiff had the option of cancelling the contract, with no costs being charged* to it, or the plaintiff could accept the equipment contingent upon the results of the *third level of testing....* Unlike the first two test, [this] was to be

---

**5.** It is a well settled rule that "[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (1985). *See also*

*Diodato v. Eastchester Dev. Corp.,* 111 A.D.2d 303, 304–305, 489 N.Y.S.2d 293, 294 (2d Dept. 1985). In light of the fact that we find the inspection clause prepared by plaintiff ambiguous, we do not consider "inspection" a prerequisite to delivery.

*performed both after all the equipment was installed and operating at ... [plaintiff's plant]* for at least four weeks and after the parties mutually agreed that the equipment was in suitable condition for continuous operation. *Each centrifuge was to be tested to determine compliance with the specification requirements and guaranteed performance....*"

*Id.* at 260 (emphasis added).

Despite the many explicit testing requirements spelled out in their contract, the *City of Cincinnati* court found tender of delivery occurred when the centrifuges were physically delivered to plaintiff. " '[T]ender of delivery' as contemplated by [Section 2–725] ... is not contingent upon inspection, testing, or acceptance." *Id.* at 262. The court distinguished the case from *Pullman* and found that the contract contemplated a post-delivery inspection which required the installation of the equipment, and "to trigger the statute of limitations at the date of the post-delivery inspection would circumvent the purpose of § 2–725." *Id.* at 263.

In *Long Island Lighting Co. v. Transamerica Delaval, supra,* plaintiff LILCO issued a purchase order to defendant TDI, awarding it the contract to manufacture three emergency diesel generators to be used in the construction of a nuclear power plant. The diesels were delivered to plaintiff in 1976, but were not installed until 1981.[6] In August 1983, the crankshaft of one of the diesels broke during pre-operational testing; cracks were found in the other two diesels as well. The plaintiff in *Long Island Lighting Co.* relied on *Pullman,* contending that tender of delivery was not made when the diesels were shipped, but rather, when they were installed. *Id.* at 1442.

The court found the *Pullman* case inapposite:

Unlike the defendant in *Pullman,* TDI *delivered the entire order* of three diesels in 1976. Moreover, the TDI/LILCO contract contained *no provision that the goods be tested to assure conformance with the contract before delivery was complete.*

*Id.* at 1455 (emphasis added).

Finally, in *Ontario Hydro v. Zallea Systems, supra,* plaintiff entered into two contracts (represented by purchase orders) with defendant whereby defendant agreed to manufacture and deliver forty expansion joints for use in construction of a heavy water plant for a nuclear generating complex. Plaintiff argued there was never a proper tender of delivery and the statute of limitations could not begin to run until plaintiff had inspected the goods and had determined whether they in fact conformed to the contract. In support of its position, plaintiff pointed to the terms of the contract which apparently provided for the inspection of the goods prior to acceptance. *Id.* at 1261.

The *Ontario* court differentiated its facts from *Pullman* noting:

In the present case, there was *no finite period of inspection.* Moreover, *the inspection clause was not directed to the tender of delivery* aspect but rather to [plaintiff's] right to reject the goods once they were delivered, for *the clause focuses not on delivery* but on the preservation of [plaintiff's] right to reject after full delivery.... Therefore, the Court finds, as a matter of law, that the tender of delivery occurred when, in accordance with the purchase orders, the expansion joints were delivered to the job site....

*Id.* at 1268 (emphasis added).

As to plaintiff's alternative position that "tender of delivery" cannot and has not occurred since the Port Authority plans and specifications required testing which could only be achieved upon installation and start-up of the equipment, Sand cites no legal authority supporting its position that "by definition" delivery was not completed until the specifications were met. Nevertheless, we conclude that the Port Authority plans and specifications testing

---

**6.** Both parties recognized the diesels would be stored prior to delivery; however, neither anticipated a five year delay in installation which was found to be primarily due to plaintiff's imprudent management of the construction project.

and capability requirements do not postpone the commencement of the statute of limitations.

The contract in the *City of Cincinnati* case, *supra,* contained many testing requirements, *including tests after installation and operation,* yet the court found tender of delivery occurred when the centrifuges were physically delivered to plaintiff, emphasizing that tender of delivery is not contingent upon inspection, testing, or acceptance. *City of Cincinnati,* 659 F.Supp. at 262.

"Whether or not the buyer at that time 'accepts' the goods ... or, on the other hand, withholds acceptance until he or she has had an opportunity to fully inspect for defects, does not affect when the buyer must institute suit for breach of warranty. This is so even if the defect does not appear until after the limitations period has run. Once the seller tenders the goods, the limitations period begins to run...." *Raymond–Dravo–Langenfelder v. Microdot, Inc.,* 425 F.Supp. 614, 617 (D.Del.1977) (footnotes omitted). This is fundamental to the principle of § 2–725 in that a breach of warranty occurs regardless of the aggrieved party's lack of knowledge of the breach.[7]

In *Raymond–Dravo–Langenfelder v. Microdot, supra,* defendant agreed to sell to plaintiff pier forms meeting certain detailed specifications which were to be used in the construction of a bridge. In an attempt to avoid the statute of limitation time bar, plaintiff argued that it "accepted the pier forms for towing only and that it reserved the right to conduct later inspections and to reject the goods if they did not conform to the specifications of the contract." *Id.* The court held, "[w]hile this may be so, it is irrelevant to the statute of limitations question. The code clearly states that a cause of action for breach of warranty accrues when tender of delivery is made." *Id.*

Notwithstanding the foregoing, notably, neither party submitted as evidence the Port Authority plans and specifications. Fed.R.Civ.P. 56 requires a party seeking summary judgment (as well as partial summary judgment) to support its motion with proof:

Sworn or certified copies of all papers or parts thereof referred to in an affidavit [supporting or opposing a motion for summary judgment] shall be attached thereto or served therewith.... When a motion for summary judgment is made ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). *See Walling v. Fairmont Creamery Co.,* 139 F.2d 318, 322 (8th Cir.1942). ("When written documents are relied on, they must be exhibited in full. The statement of the substance of written instruments or affiant's interpretation of them or of mere conclusions of law or restatements of allegations of the pleadings are not sufficient."), *Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.,* 372 F.Supp. 503, 506 (E.D.N.Y.1974), (*quoting Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972)) ("A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in so doing he risks the possibility that there will be no trial.").

■ If there is documentary evidence to support an assertion, Rule 56 requires a party to come forward with it. *Id.* When documents are not submitted, they "cannot ... be relied upon to raise a genuine issue of fact." *Washington Post Co. v. Keogh,* 365 F.2d 965, 971 (D.C.Cir.1966), *cert. denied, Keogh v. Washington Post Co.,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548

7. As defendant points out, as of the first half of 1980 (when the chillers were started up) the statute of limitations still had approximately two years left to run, i.e. until March 1982.

Accordingly, Sand had more than enough time to bring this action after it acquired knowledge of the alleged defects.

(1967). By its total failure to submit any evidence regarding the contents or applicability of the Port Authority plans and specifications, Sand has failed to raise any genuine issue of material fact with respect to them. Therefore, Sand can neither obtain partial summary judgment nor defeat defendant's motion based upon evidence not before the court.

■ In an attempt to escape the narrow interpretation courts have applied to U.C.C. § 2–275(1), plaintiff asserts that this is a situation involving future performance and thus, under the statutory exception of § 2–275, the breach did not occur until start up of the chillers when the breach "is or should have been discovered...." N.Y. U.C.C.Law § 2–725(2) (McKinney 1964). Sand maintains that the plans and specifications required Airtemp to provide chillers with certain performance capabilities (*i.e.*, 1800 GPM capacity for chilled water and 2620 GPM capacity for condenser water) which could only be determined when the chillers were actually put into service. Plaintiff therefore reasons that "this in effect constitutes 'future performance' requirements." (Sand Memo in Support of Motion for Partial Summary Judgment at 6.).

Plaintiff's argument is based upon the fact that the Port Authority plans and specifications provide, *inter alia*, for testing of the chillers after start up. We must note once again that plaintiff has failed to submit the specifications to the court; we cannot examine the language contained within this apparently significant document. Accordingly, pursuant to Fed.R.Civ.P. 56, plaintiff's argument must be rejected.

Even if we were to assume that the specifications are applicable and are as Sand describes them in its memorandum, we hold plaintiff's "future performance" argument non-meritorious. Section 2–725(2) provides that "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty *explicitly extends to future performance of the goods*...." N.Y.U.C.C.Law § 2–275(2) (McKinney 1964) (emphasis added). "Most courts have been very harsh in determining

whether a warranty explicitly extends to future performance. Emphasizing the word 'explicitly,' they have ruled that ... most express warranties cannot meet the test and no implied warranties can since, by their very nature, they never 'explicitly extend to future performance.'" *Standard Alliance*, 587 F.2d 813, 820. *See also Stumler*, 644 F.2d at 671; *Carabello v. Crown Controls Corp.*, 659 F.Supp. 839, 842 (D.Colo.1987); *City of Cincinnati*, 659 F.Supp. at 264; *Raymond*, 425 F.Supp. at 618; *Binkley Co. v. Teledyne Mid–America Corp.*, 333 F.Supp. 1183, 1186 (E.D.Mo. 1971), *aff'd*, 460 F.2d 276 (8th Cir.1972); *Poppenheimer v. Bluff City Motor Homes, Division of Bluff City Buick Co.*, 658 S.W.2d 106, 110–111 (Tenn.Ct.App. 1983); *Centennial Ins. Co. v. General Elec. Co.*, 74 Mich.App. 169, 170–171, 253 N.W.2d 696, 697 (Mich.Ct.App.1977).

The term "explicit" has been explained as plain language which is distinctly stated, clear and unequivocal to the point that there is no doubt as to its meaning. *Binkley*, 333 F.Supp. at 1186; *Centennial*, 253 N.W.2d at 697. If words are merely implied or conveyed by implication they are not explicit. *Id.* As one court explained:

"The difficulty of determining conformity with a warranty at the time of delivery is a problem common to many situations involving warranties by description. Such difficulties have not been regarded as controlling, however, in the absence of contract language *explicitly* warranting future performance. The drafters of the UCC decided that the seller's need to have some clearly defined limit on the period of its potential liability outweighed the buyer's interest in an extended warranty and reserved the benefits of an extended warranty to those who *explicitly* bargain for them."

*Raymond*, 425 F.Supp. 614, 618 (emphasis added).

Even if we look to the actual language plaintiff alleges is contained within the specifications, we do not find any explicit language that can be construed as a future performance provision. According to Sand, the Port Authority plans and specifications

required Airtemp to provide the chillers with certain performance capabilities, including 1800 GPM capacity for chilled water, 2620 GPM capacity for condenser water, trained representatives for a period of three days per machine to assist in the start up of each of the chillers, certain testing to be performed by Airtemp after installation of the chillers, as well as numerous other requirements which could only be determined after installation.

Plaintiff attempts to circumvent the omission of language which explicitly warrants future performance by claiming that the language is inherent in the terms of the Port Authority document; Sand maintains that it could not determine whether the machinery met the required capacity requirements until actual start up of the chillers. In light of the "explicit" language requirement mandated by the U.C.C., we hold that the Port Authority plans and specifications cannot "in effect" apply to future performance.

Further, an examination of the warranties contained in the purchase order and alleged acknowledgment form of Sand and Airtemp, respectively, reveals that neither explicitly extended to future performance.

Plaintiff's warranty states, in pertinent part: "... Seller agrees to replace without charge to Purchaser said material and equipment, or remedy any defects, latent or patent, not due to ordinary wear and tear ... which defects may develop within one year of acceptance by Owner...." (Sherman Affidavit Ex. C). In relevant part, defendant's warranty provides: "Airtemp's obligation under this warranty is limited solely to repairing or replacing parts ..." (Sherman Affidavit Ex. E). Both warranties specifically contain provisions for the repair or replacement of defective goods and make reference to a limited time period.

The rule regarding a repair or replacement warranty was set forth in *Ontario, supra,* and the distinction between such a warranty and one which warrants future performance was drawn therein:

> A warranty of future performance of a product must expressly provide some

form of guarantee that the product will perform in the future as promised.... On the other hand, a repair or replacement warranty does not warrant how the goods will perform in the future. Rather, such a warranty simply provides that if a product fails or becomes defective, the seller will replace or repair within a stated period.

> Thus, the key distinction between these two kinds of warranties is that a repair or replacement warranty merely provides a *remedy* if the product becomes defective, while a warranty for future performance *guarantees the performance* of the product itself for a stated period of time.

*Ontario,* 569 F.Supp. 1261, 1266 (emphasis in original). The court in *Ontario* also set forth sound policy reasons for the "narrow exception" provided by U.C.C. § 2–725(2):

> ... [I]t was designed by the drafters of the Uniform Commercial Code to serve the important function of providing a point of finality for businesses after which they could destroy their business records without the fear of a subsequent breach of contract for sale or breach of warranty suit arising to haunt them.

*Id.*

To find that the Port Authority plans and specifications or the parties' warranties were covered by the 2–725(2) exception "would require an entirely strained and unrealistic interpretation of the phrase 'future performance of the goods.' Moreover, such a result would also require that we completely ignore the code drafter's command that the warranty be explicit." *Poppenheimer,* 658 S.W.2d 106, 111.

In light of the foregoing, we find that "tender of delivery" within the meaning of U.C.C. § 2–725 occurred when the chillers were shipped between January and March 1978. Hence, the statute of limitations began to run at that time, expiring at the *latest,* March 1982. *See Ontario,* 569 F.Supp. at 1269, *Pullman,* 662 F.2d at 919. Since this action was commenced December 16, 1982, more than four years after tender of delivery, it is time-barred as prescribed by the U.C.C.

## CONCLUSION

In accordance with our findings herein-above, we are constrained to and do grant defendant's motion for summary judgment and dismiss as moot plaintiff's motion for partial summary judgment.

SO ORDERED.