**H. SAND & CO., INC.,**
**Plaintiff–Appellant,**

v.

**AIRTEMP CORPORATION,**
**Defendant–Appellee.**

No. 1099, Docket 90–7879.

United States Court of Appeals,
Second Circuit.

Argued Feb. 25, 1991.

Decided June 3, 1991.

Stuart J. Moskovitz, (Berman, Paley, Goldstein & Berman, New York City, of counsel), for plaintiff-appellant.

John B. Sherman (Weisman, Celler, Spett & Modlin, New York City, of counsel), for defendant-appellee.

Before OAKES, Chief Judge, CARDAMONE and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal centers on the date of delivery of four chillers used in the air conditioning system at the New York Port Authority Bus Terminal Building in Manhattan. Unlike beauty, the delivery of property is not in the eye of the beholder. That is a subjective notion, while the transfer of goods occurs when the facts of delivery are objectively established.

The appellant, H. Sand & Co., Inc. (Sand), ordered the chillers in 1977 from the appellee, Airtemp Corporation, in fulfillment of Sand's sub-contract with the general contractor, Carlin–Atlas Joint Venture, to install the heating, ventilation, and air conditioning in the reconstruction and expansion of the Bus Terminal at the corner of 8th Avenue and 40th Street in New York City. Sand appeals from a grant of summary judgment dismissing its suit for breach of warranty on the contract calling for delivery of the chillers, from an earlier ruling dismissing Count IV of its amended complaint, and from a denial of its motion for reargument.

Sand sued Airtemp late in 1982 alleging the chillers were defective and that it expended considerable funds repairing them. Sand amended its complaint to include Count IV, which asserts that Airtemp is liable not only in damages to Sand, but also

for damages to the Port Authority arising from problems with the defective chillers because, Sand alleged, the Port Authority may hold Sand liable for those same damages. The district court dismissed Count IV *sua sponte* and granted summary judgment in favor of Airtemp on the other counts in Sand's complaint, holding that they were all barred by the statute of limitations. Because we think the district court overlooked a genuine issue of material fact that precludes the grant of summary judgment, we reverse and remand the case to it for further proceedings.

## FACTS

Sand asserts it entered into the 1977 contract with Airtemp for four motor driven hermetic centrifugal chillers, which constituted a cooling system, and that under the contract accessories and services were also to be provided. Sand sent its purchase order form—dated June 6, 1977 and marked job number 1208–AA—to Airtemp for the four chillers. The order was received by Airtemp a week later, as indicated by a stamp on its face. In reply, Airtemp sent Sand an invoice dated March 1, 1984 for one of the chillers, referencing Sand's purchase order number 1208–AA. This is the only document acknowledging Sand's order.

All four chillers were shipped by Airtemp to Sand's agent, Associated Rigging & Hauling Corp., between January and March, 1978. One of them (chiller # 4) was not tested prior to being shipped because by the time it was ready to be tested Airtemp was in the process of relocating its testing facilities from Kentucky to Edison, New Jersey. In November 1978 chiller # 4 was sent—at Airtemp's expense and direction—from Associated Rigging & Hauling to Airtemp's Edison plant for a test run. After testing the chiller, Airtemp shipped it back to Associated Rigging & Hauling in January, 1979.

The general contractor, Carlin–Atlas, did not start up any of the chillers until the middle of 1980. Sand states that shortly after being started the chillers exhibited defects. When it contacted Airtemp re-

garding these problems, Airtemp refused to perform any repair work without additional payment. As a result, Sand made its own repairs and withheld $10,000 of the purchase price. The Port Authority officially accepted the equipment on May 23, 1981.

## PRIOR PROCEEDINGS

On December 16, 1982 Sand sued Airtemp's parent corporation, Fedders Corp., in the Supreme Court of New York County for damages arising out of the defects in the chillers. The parties agreed to dismiss the action without prejudice to allow Sand to bring its suit in federal court, and further stipulated that the action be deemed to have been commenced on December 16, 1982 for statute of limitations purposes. After Sand brought its suit in the United States District Court for the Southern District of New York (Cooper, J.), Airtemp asserted the limitations bar and counterclaimed for the withheld $10,000.

In December 1983 the Port Authority told Carlin–Atlas it was liable for approximately $650,000 in expenses incurred as a result of the defective chillers. On December 16, 1984 Carlin–Atlas and the Port Authority signed an agreement of settlement and general release under which the Port Authority agreed to limit its claim against Carlin–Atlas for damages to the amount:

> if any, finally and unappealably awarded and received by [Carlin–Atlas'] subcontractor, H. Sand & Company, in their pending lawsuit against the centrifugal chiller manufacturer for damages, but only insofar as the award is ... exclusively based upon the claim or potential claim of the Contractor for damages against H. Sand either under a theory of indemnity to the Contractor or otherwise ... minus 25% of the amount of said damages, representing the attorney's fees of H. Sand & Co. [or 40% of the amount of a settlement in the same suit after 25% for attorney's fees].

A copy of the same contract, signed by Sand's Senior Vice President, bears an additional paragraph stating at the end:

Acknowledged, agreed and accepted this 18 day of January 1985 and further agreed that, except as aforesaid, no other right of [Carlin–Atlas] or H. Sand under their applicable subcontract shall be deemed to be waived or released hereunder and it is further agreed that, as between the Contractor and H. Sand, all of the terms and provisions of this agreement shall be binding upon and shall enure to the benefit of H. Sand.

On January 25, 1984 Sand amended its complaint against Airtemp to add a Count IV for the amount of the Port Authority's damages.

In late 1985, the district court requested legal memoranda setting forth the parties' legal positions regarding the viability of Sand's claim on behalf of the Port Authority for damages. Both parties submitted memoranda, and on April 18, 1986 Judge Cooper filed an order dismissing *sua sponte* Count IV of the complaint. On October 21, 1986 the court denied Sand's motion for reconsideration.

Airtemp thereafter filed a motion for summary judgment. The district court granted the motion and dismissed Sand's action as time-barred under the New York Uniform Commercial Code's (U.C.C.) four-year statute of limitations. 738 F.Supp. 760 (S.D.N.Y.1990). On August 30, 1990 it denied plaintiff's motion for reargument, which alleged that summary judgment had improperly been granted without regard for a genuine issue of material fact— whether the shipment of chiller # 4 in 1978 was a "tender of delivery" sufficient to trigger the statute of limitations. 743 F.Supp. 279 (S.D.N.Y.1990). From these several orders, Sand appeals.

### DISCUSSION

#### I   *Tender of Delivery*

■ We first consider whether the district court properly granted summary judgment dismissing Sand's action as time-barred under the applicable statute of limitations, viewing the evidence, as we must, in the light most favorable to Sand, the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct.

993, 994, 8 L.Ed.2d 176 (1962). The contract must be construed under applicable state law including the state statute of limitations. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agree that New York law governs the contract and that New York's U.C.C. provides the substantive law governing this sale of goods.

The applicable statute of limitations is set forth in N.Y.U.C.C. § 2–725:

(1) An action for breach of any contract for sale must be commenced within *four years* after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made*, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered. (emphasis added).

The district court found that—for purposes of § 2–725(2)—tender of delivery of the chillers took place between January and March 1978 when chiller # 4 was first delivered to Associated, so that the statute of limitations expired, at the latest, in March 1982, nearly nine months before Sand filed suit in December 1982. 738 F.Supp. at 771. Sand contends that tender of delivery did not take place until January, 1979 when the same chiller was redelivered to Associated—after Airtemp had tested it—so that the statute of limitations did not expire until January, 1983 one month after it filed suit. There is no question that the resolution of the date of tender of delivery is material, for Sand's ability to bring its claim turns on the resolution of this issue of fact. The only question, therefore, is whether the issue of fact is genuine, that is, whether there is sufficient evidence to allow a jury to find that tender of delivery

occurred within four years of the time Sand filed suit. *See* U.C.C. § 2–725(1).

### A. Appellant's Contention

Tender of delivery takes place under the U.C.C. when the seller puts and holds "conforming goods at the buyer's disposition." N.Y.U.C.C. § 2–503(1) (McKinney 1964). Sand argues that the chiller in question was shipped to Associated in March 1978 for the convenience of Airtemp, so that it could be stored in a safe place while Airtemp was relocating its testing facilities. Sand asserts that this was not an actual delivery and that chiller # 4 was not at its disposal until January 1979, so that under § 2–503 tender of delivery could not have occurred until that date.

Sand points to three documents to support its argument. The first is a letter from Sand to Airtemp dated July 27, 1978 stating that chiller # 4 was shipped without being tested "due to the moving of your plant to Edison, N.J. Arrangements were made at that time with your Mr. Dave Burke that the machine would be shipped from our riggers yard at your expense to your plant for testing." Second, is a letter dated October 30, 1978 from David Burke, Airtemp's Northeast Manager, to Associated stating that "You [Associated] are currently holding this Chiller for H. Sand Company to be eventually delivered to Port of New York Bus Terminal," and that Airtemp's letter is to be used "as Authorization for the Return of the Airtemp Centrifugal Chiller ... to Airtemp." The letter directs Associated to ship the chiller to Airtemp's Edison facility and to call Mr. Burke if Associated had any questions. Third, Sand points to a memo written by David Burke dated February 23, 1979 stating that when the Port Authority asked that the chiller be shipped to Airtemp's new facility to be tested after being informed that testing could not be done immediately,

> At Lloyd Larkin's request, I informed The Port of New York & the Contractor [Carlin] that the 4th Unit was being delivered to the Rigger's Yard rather than our plant at Edison for security reasons, i.e., there was considerable construction

work involved in the plant re-organization and the unit might be damaged due to this renovation. Lloyd also said there was simply no place to store it at Edison.

These three documents would allow a reasonable jury to conclude Associated was holding the chiller for Airtemp's convenience and at Airtemp's disposition, not Sand's. Airtemp authorized Associated's release of chiller # 4 for testing, an act inconsistent with Sand's control of the goods. Further, Burke's representation that the chiller was shipped to Associated because of security concerns and because of the lack of storage space at Edison tends to confirm that the chiller was not delivered in March, 1978, but merely stored for Airtemp's convenience between March and November 1978. We of course intimate no view as to how this issue should be decided at trial where all relevant evidence will be considered.

### B. Hearsay Documents Considered in Discovery

At oral argument, Airtemp asserted that the three documents upon which Sand relies are not properly before us because they are inadmissable hearsay presented to the district court only upon the affidavit of Sand's attorney, who lacks personal knowledge of the matters asserted. It is true that on a motion for summary judgment, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). This rule does not, as appellee suggests, require that parties authenticate documents where appellee did not challenge the authenticity of the documents in the district court. *See* 10 A.C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2722 at 60 & n. 38 (2d ed. 1983 & Supp.1991) (collecting cases). With respect to the objection that the documents are hearsay, the Rule 56(e) requirement means only that " *'[h]earsay testimony ...* that would not be admissible if testified to at the trial may not properly

be set forth in [the Rule 56(e)] affidavit.'" *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir.1986), *quoting* 6 Moore's Federal Practice Para. 56.22[1], at 56–1312 to 56–1316 (2d ed. 1985) (emphasis added). But none of the three documents discussed are hearsay because each falls within the definition of an admission by a party-opponent under Federal Rule of Evidence 801(d)(2). Further, we note that the district court in determining both the initial motions for summary judgment and the motion for rehearing examined these documents on their merits. 743 F.Supp. at 280. Any objection to consideration of these same documents, now that the case has been appealed, comes late.

### C.  Appellee's Contentions

Airtemp argues further that even if it is proper to consider these documents, they do not preclude a grant of summary judgment. Airtemp makes three separate arguments in support of this proposition. Its three arrows of argument all miss the mark. We address each separately.

1.  Airtemp contends that testing is not, as a matter of law, a precondition to tender of delivery, even when contractually required, invoking *City of Cincinnati v. Dorr–Oliver, Inc.*, 659 F.Supp. 259, 262 (D.Conn.1986), and *Raymond–Dravo–Langenfelder v. Microdot, Inc.*, 425 F.Supp. 614 (D.Del.1977). These cases establish that where a contract simply provides for delivery to be followed by testing, the pretesting delivery constitutes "tender of delivery" within the meaning of N.Y.U.C.C. § 2–725(2) (McKinney 1964). On the other hand, parties may by contract agree that delivery will not be made until some form of testing has been completed. *See City of New York v. Pullman, Inc.*, 662 F.2d 910, 919 (2d Cir.1981) (where contract required test of small sample before design deemed to conform to contract and before seller was allowed to deliver bulk of goods, receipt of sample did not constitute tender of delivery), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). Yet, whether testing was or was not a precondition to the delivery of the chillers is not the issue upon which this case hinges. Rather, it is whether Airtemp, when it originally shipped the chiller in March 1978, intended to and in fact did place chiller #4 at Sand's disposition. The fact that Airtemp may not have wanted to turn the chiller over because it wished to test it first is a subjective motive, peripheral to the main question before us: whether, viewing the facts objectively, delivery was in fact tendered.

2.  Airtemp next argues that the contract between it and Sand did not require testing. Whether or not Airtemp was required by contract to test the chillers before delivery is somewhat academic in the present posture of this case. If it was required to test them then the statute of limitations did not begin to run until chiller #4 was tested and delivered in January 1979. If the contract did not require Airtemp to test the chillers before delivery, the issue still remains whether the March 1978 shipment was an attempted delivery or merely convenient storage that did not put chiller #4 at Sand's disposal.

3.  Further, Airtemp asserts that delivery of nonconforming goods may constitute a tender of delivery under U.C.C. § 2–503. *See Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813, 818–19 (6th Cir.1978) (tender of delivery of defective machine occurred when machine first delivered, not when repair attempts finally abandoned, because tender of delivery occurs as measured against the contract obligation even when goods are defective), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Uchitel v. Tripler & Co.*, 107 Misc.2d 310, 314, 434 N.Y.S.2d 77 (N.Y.App. Term 1st Dept.1980) ("a tender of nonconforming goods starts the four-year breach of warranty period running"). Airtemp correctly recites the law regarding tender of non-conforming goods, but the recitation is irrelevant because it begs the question of whether the March 1978 shipment—whether of conforming or nonconforming goods—was a tender of delivery.

### D.  Resolution of Contentions

We undertake now to resolve the disputed contentions regarding delivery. If

the fourth chiller was not placed at Sand's disposal until January 1979 then, at least as to that chiller, the suit instituted on December 16, 1982 was not time-barred because it fell within four years of January 1979. Moreover, Sand has alleged that the four chillers constituted an entire system, an allegation that we must take as true at this stage of the litigation. The factual basis for, and legal implications of, Sand's position, including any possible applicability of N.Y.U.C.C. § 2–612 (McKinney 1964) ("Installment Contract") must be explored on remand.

Because there is a genuine issue of material fact as to whether the March 1978 shipment of chiller #4 constituted tender of delivery for purposes of the accrual of Sand's cause of action, we need not consider Sand's alternative argument that the terms of its warranty explicitly extended to future performance of the goods under U.C.C. § 2–725. Nor do we need to address Airtemp's assertion that Sand failed to comply with U.C.C. § 2–607(3)(a). The effect of that section of the Code, predicated on both the prior tender and acceptance of the goods, cannot be decided until the issues of tender and acceptance have been resolved upon remand. Although the district court did not have to reach the question of whether there was a conflict in warranty terms due to its resolution of the tender of delivery issue, we also note that there is little or no evidence in this record that Airtemp's warranty terms were ever sent to Sand.

## II *Count IV*

■ Sand believes that the district court incorrectly dismissed Count IV of its amended complaint alleging damages of $625,000. It asserts it might be liable for that amount because the Port Authority had notified the general contractor, Carlin–Atlas, that, as a result of problems with the chillers, the Port Authority was claiming such an amount from Carlin–Atlas. An exception to the requirement that a person asserting a contract claim be in privity with the defendant is that a contractor may sue a building owner for damages incurred by a subcontractor who lacks privity with the

owner. *See United States v. Blair,* 321 U.S. 730, 737–38, 64 S.Ct. 820, 823–24, 88 L.Ed. 1039 (1944). Even assuming Sand can invoke that exception in this case, it is recognized that a party may not sue another for its liability to a third party when that liability is merely speculative. *See Dunn v. Uvalde Asphalt Paving Co.,* 175 N.Y. 214, 216–18, 67 N.E. 439 (1903) (defendant could not counterclaim for damages to adjoining property owners who had sued him, but whose claims had not yet been paid); *Esbitt v. Dutch–American Mercantile Corp.,* 335 F.2d 141, 143 (2d Cir.1964) (defendant could not retain money for indemnity where "the defendant has not yet incurred any liability and may never incur liability").

In this case the damages for which Sand claims it might be held liable are not simply speculative, they are nonexistent. Even assuming a) that Carlin–Atlas could sue Sand on their contract and b) that Carlin–Atlas' cause of action accrued in the middle of 1980 when the chillers were first started up and c) that the Carlin–Atlas contract is not one for the sale of goods governed by the U.C.C., but is instead a contract for services subject to a six-year statute of limitations, *see* N.Y. C.P.L.R. § 213(2) (McKinney 1990), Carlin–Atlas' ability to sue Sand would have expired in 1986. Neither the Port Authority nor Carlin–Atlas has yet sued Sand, and it appears that such an action would now be time-barred.

■ Sand points to the agreement of settlement and general release between the Port Authority and Carlin–Atlas dated December 16, 1984, a copy of which it signed on December 18, 1984, and argues that the fact that it signed that agreement demonstrates that its damages are definite. It cites no New York authority suggesting that such an act binds it, makes it liable to the Port Authority or to Carlin–Atlas, or extends the expired statute of limitations. The only authority we have found upon which Sand might rely in arguing that its signature tolls the statute of limitations is N.Y.Gen.Oblig.Law § 17–101 (McKinney 1978), which provides that "[a]n acknowledgment or promise contained in writing

signed by the party to be charged" revives the statutory period.

Nevertheless, even assuming legal damages constitute the sort of debt governed by this section and that Sand's additional paragraph and signature constitute sufficient acknowledgement, that section would only revive the cause of action for another six years. *See United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO v. Great American Industries, Inc.*, 479 F.Supp. 216, 227 (S.D.N.Y.1979). Sand signed the agreement in December 1984. The statute of limitations would have expired, at the latest, in December 1990. Therefore, any action against Sand by Carlin–Atlas or the Port Authority based on the agreement is time-barred. It follows that damages asserted by Sand on behalf of those entities are not present. Thus, the dismissal of Count IV was entirely appropriate.

## CONCLUSION

The district court improperly granted summary judgment on the basis that the action is barred by the statute of limitations since there exists a genuine issue of material fact as to whether tender of delivery of chiller # 4 occurred in March 1978 or in January 1979. We therefore reverse the dismissal of Sand's amended complaint, except as to the dismissal of Count IV which is affirmed, and remand the case to the district court for further proceedings.

Affirmed, in part, reversed, in part, and remanded.