**CITY OF CINCINNATI, OHIO, et al., Plaintiffs,**

v.

**DORR–OLIVER, INC., Defendant.**

**Civ. No. B 84–431 (TFGD).**

United States District Court,
D. Connecticut.

May 1, 1986.

Ruling on Defendant's Motion
for Summary Judgment Feb. 19, 1986.

Madelaine F. Grossman, Jonathan D. Elliott, Levett, Rockwood & Sanders, Westport, Conn., Gary J. Smith, Jose I. Sandoval, Beveridge & Diamond, Washington, D.C., pro hac vice, for plaintiffs.

William J. Wenzel, G. Kenneth Bernhard, George J. Markley, Richard A. Johnson, William B. Rush, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendant.

Thomas W. Witherington, Sheila M. Tierney, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for third-party defendant.

DALY, Chief Judge.

After review and over objection, the ruling of the Magistrate is hereby ADOPTED, APPROVED and RATIFIED. Summary judgment will therefore enter on Counts One, Two, Three and Five. Partial summary judgment shall enter on Count Four in accordance with the Magistrate's ruling.

RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

THOMAS P. SMITH, United States Magistrate.

I.

This is an action sounding in contract and tort requiring a construction of the applica-

ble statutes of limitations, Conn.Gen.Stat. § 42a–2–725 and § 52–577. Various theories of liability are advanced in the five count complaint. Before the court is the defendant's motion for summary judgment, Rule 56, F.R.Civ.P., on four of these counts and for partial summary judgment on the remaining count. Jurisdiction is predicated on 28 U.S.C. § 1332, venue upon § 1391. For the reasons set out below, the defendant's motion should be granted.

## II.

The facts applicable to the resolution of the pending motion are easily recounted. The plaintiff buyer and the defendant seller entered into a contract (Contract 21B) on September 22, 1972, for the purchase of 16 centrifuges for the thickening of excess activated sludge at the plaintiff's Mill Creek Wastewater Treatment Plant. These centrifuges were delivered to the plaintiff on July 22, 1974. Degritters, also purchased pursuant to Contract 21B, were delivered on that date as well.[1]

The contract provided for three levels of testing for the equipment. There was to be, first, a shop test for each of the 16 centrifuges to be delivered. The completely assembled centrifuge was to be tested at the defendant's manufacturing plant and was to be witnessed by a Registered Professional Engineer. The defendant was to then forward a description of the shop test to the plaintiff on areas such as vibration analyses. No centrifuge was to be shipped to the plaintiff until the witnessing engineer had approved the shop test reports. The second test was to be a simulated performance test. Described in the contract as a Witnessed Test, it was to be performed at a wastewater treatment plant of the defendant's choice, subject to the plaintiff's approval, that utilized the activated sludge process to treat municipal sewage. Excess activated sludge produced at this testing site was to be used in the test, which was to run for twelve hours. The test was to be conducted on only one centrifuge, with results relating to sludge concentration and the like being reviewed

by the plaintiff. If the equipment failed initially, the test could be performed again. If the equipment failed a third time, the plaintiff had the option of cancelling the contract, with no costs being charged to it, or the plaintiff could accept the equipment contingent upon the results of the third level of testing, the Acceptance Test. Unlike the first two tests, the Acceptance Test was to be performed both after all the equipment was installed and operating at the Mill Creek site for at least four weeks and after the parties mutually agreed that the equipment was in suitable condition for continuous operation. Each centrifuge was to be tested to determine compliance with the specification requirements and guaranteed performance. If the equipment failed after three tries, (1) the defendant could be allowed additional time to replace or modify the equipment, (2) the equipment could be accepted at a reduced price, (3) the money paid to the defendant could be returned to the plaintiff, with the plaintiff paying for its use of the equipment, or (4) acceptance could be conditioned upon additional provisions negotiated by the parties.

The equipment passed the first tests, the Shop Tests, but failed the Witnessed Tests at the Hazleton Sewage Treatment Plant and again at Cleveland Southerly Wastewater Treatment Plant in Cleveland, Ohio. The plaintiff in May 1974 then "waived the requirement of a further witnessed test and allowed the equipment to be shipped, subject to satisfactory completion of the acceptance test provided for by the contract after installation at the Mill Creek Plant." Plaintiff's Memo in Opposition to Defendant's Motion for Summary Judgment, Filing No. 94, at 10.

The defendant agreed to a preliminary test run in February 1977 to determine whether the centrifuges could operate successfully without the complementing screens. They could not. The defendant then offered to provide the screens at its own expense, with installation costs falling to the plaintiff. The screens were delivered on April 26, 1978. Following the installation of the screens, in July 1980, the

---

1. The total contract price was $1,457,633.00.

Acceptance Tests were begun. Reports of the tests circulated for some time, a delay caused partially by the installation of parts into the Unit 1 centrifuge, and on November 5, 1981, the plaintiff declared that the defendant's contractual obligations had been fulfilled and released the defendant's performance bond.

Problems with the equipment continued subsequent to the acceptance and ultimately the equipment was shut down in 1982. The defendant proposed a solution to the problems encountered by the plaintiff, but that proposal was rejected in 1983 and this litigation then ensued on June 29, 1984.

Contract 21B provided two types of express warranties or guarantees. There were, first, various performance guarantees on which the acceptance was conditioned. For example, Section 1.4 of Contract 21–B's specifications provided that the centrifuges "shall be suitable for continuous, heavy duty, 24 hour per day service, when processing excess activated sludge," and that the centrifuge equipment shall be capable of concentrating the activated sludge to a minimum specified solids concentration and of capturing a minimum percentage of the solids in the thickened sludge. Second, Section 1.14 of Contract 21–B provided a guarantee "against defects in workmanship and material for a period of eighteen (18) months from the date of acceptance."

### III.

*The Contract Counts*

The plaintiff has alleged in its complaint four causes of action sounding in contract. A breach of contract of sale is alleged in count one, a breach of express warranties relating to specific standards of performance in count two, a breach of implied warranties of merchantability and fitness for a particular purpose in count three, and a breach of express guarantees against defects in material and workmanship in count four. The general breach of contract allegation in count one includes and incorporates the claims of counts two, three and four, but it also rests on the claim that the defendant failed to offer conforming goods

when the acceptance tests were run in July 1980. Despite this claimed distinction, however, the four counts sounding in contract may be addressed in the frame work of one analysis.

There is, as a threshold matter, no dispute that the issue of whether the statute of limitations has run as to counts 1–4 is controlled by § 42a–2–725, *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which states in part that

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

The principles of law relating to a motion for summary judgment such as this one are well settled. To grant a motion for summary judgment there can be no "genuine issue as to any material fact" and the moving party must be "entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). *Schwabenbauer v. Board of Ed., Etc.*, 667 F.2d 305, 313 (2d Cir.1981). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American Int'l Group, Inc. v. London American Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indust. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)). Moreover, there must be no controversy as to inferences which may be drawn from the facts of record. *Phoenix Savings & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967). In determining whether or not there is a genuine factual issue in the case, the court must "resolve

all ambiguities and draw all reasonable inferences against the moving party." *Schwabenbauer, supra,* 667 F.2d at 313; *see also United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) *(per curiam );* Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980).

"A summary judgment motion can be an appropriate vehicle for presenting a statute of limitations argument. *See, e.g., DeLuca v. Atlantic Refining Co.,* 176 F.2d 421 (2d Cir.1949) (Hand, J.). However, as with all summary judgment motions, the burden is on the moving party initially to show the absence of any genuine issue concerning any material fact." *Giannotti v. Foundry Cafe,* 582 F.Supp. 503, 505 (D.Conn.1984), citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is thus precluded where there are genuine fact issues relating to the statute of limitations defense.

The defendant's argument in principle is quite simple. Asserting that there is no genuine fact as to the delivery dates for the equipment sold to the plaintiff, the defendant contends that it must necessarily prevail because the tender of delivery dates as contemplated by § 42a–2–725 occurred beyond the four year statute of limitations period and because the plaintiff does not qualify for the "explicit guarantee of future performance" exception of § 42a–2–725(2). But conceding that the guarantee against defects in material and workmanship at issue in count four likely qualifies for the § 42a–2–725(2) exception, the defendant moves for summary judgment only as to counts one, two, and three. As to count four, the defendant moves for partial summary judgment to the extent that this court hold that the warranties in count four do not apply to counts one, two and three.

The plaintiff apparently concedes that the physical delivery of the equipment at issue took place beyond the four year statute of limitations period, making the issue

before the court a purely legal one, but it contends first that this fact is irrelevant because the date of delivery does not control. Rather, the argument runs, it is the date of acceptance that controls for determining whether the statute of limitations has run. On this score, the plaintiff contends, the suit was instituted in a timely manner because the equipment was not accepted, following extensive contract-mandated testing, until November 5, 1981.

■ The record reveals that many tests were performed and that the plaintiff accepted the equipment within four years of filing suit. Unfortunately for the plaintiff, however, "tender of delivery" as contemplated by § 42a–2–725 is not contingent upon inspection, testing, or acceptance. In Connecticut, as is true elsewhere, absent the § 42a–2–725(2) exception, a breach of warranty occurs at the time of the delivery of the goods. *Boains v. Lasar Manufacturing Company,* 330 F.Supp. 1134, 1135 (D.Conn.1971) (Blumenfeld, J.); *Rempe v. General Electric Co.,* 28 Conn.Supp. 160, 254 A.2d 577 (1969). This rule may appear harsh, but it is central to the principle of § 42a–2–725(2) that a breach of warranty occurs "regardless of the aggrieved party's lack of knowledge of the breach." *Binkley Co. v. Teledyne Mid-America Corp.,* 333 F.Supp. 1183, 1187 (E.D.Mo.1971) *aff'd,* 460 F.2d 276 (8th Cir.1972). "Whether or not the buyer at that time 'accepts' the goods, as that term is used in the Code, or, on the other hand, withholds acceptance until he or she has had an opportunity to fully inspect for defects, does not affect when the buyer must institute suit for breach of warranty. This is so even if the defect does not appear until after the limitations period has run. Once the seller tenders the goods, the limitations period has run." *Raymond-Dravo-Langenfelder v. Microdot, Inc.,* 425 F.Supp. 614, 617 (D.Del.1977), citing White & Summers, Uniform Commercial Code ("UCC") § 11–8, p. 341.[2]

**2.** That the defendant may have attempted repairs prior to the acceptance date has no bearing on the issue of whether the acceptance date rather than the tender of delivery date controls.

*See Binkley Co. v. Teledyne Mid-America Corp.,* 333 F.Supp. 1183 (E.D.Mo.1971), *aff'd,* 460 F.2d 276 (8th Cir.1972) (applying Missouri law); *Tomes v. Chrysler Corp.,* 60 Ill.App.3d 707, 18

The plaintiff's alternative argument supporting its initial position that tender of delivery did not take place until the time of acceptance is equally unavailing. The plaintiff, looking to Conn.Gen.Stat. § 42a–2–503, argues that tender of delivery could not occur until the defendant tendered conforming goods, i.e., until the goods were accepted. To support this argument, the plaintiff relies heavily on *City of New York v. Pullman, Inc.*, 662 F.2d 910, 919 (2d Cir.1981) *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). This precise argument was presented and rejected in the factually similar case of *Ontario Hydro v. Zallea Systems, Inc.*, 569 F.Supp. 1261, 1267 (D.Del.1983). Relying upon the *Ontario Hydro* court's analysis of *Pullman*, this court similarly rejects the plaintiff's argument here.

In *Pullman*, the plaintiff buyer contracted to buy some 754 subway cars from the defendant seller. The contract provided that prior to acceptance of the cars, the buyer would be permitted to test ten of the cars for thirty days. In this instance, the Second Circuit ruled, delivery of the ten cars did not constitute tender of delivery, stating that

> The contract specifications provided that the [subway car] design would be required to pass a 30 day on-line inspection before it would "conform" to the contract requirements. Until that inspection occurred, therefore, there could be no tender of "conforming goods" within the meaning of § 2–503(1). Moreover, under the contract appellees were not obliged to take any steps until appellants conformed to the specifications by delivering cars which had completed the 30 day test, since the contract specifically provided that any cars built before the 30 day test was completed were constructed at the seller's risk. Accordingly, tender of delivery could not occur, and did not occur until the required test of the sample train was completed.

After first noting that tender of delivery can be read more broadly under the Code

Ill.Dec. 71, 377 N.E.2d 224 (1978) (efforts to repair steering system on boat did not toll stat-

"to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation," Comment 1 to U.C.C. § 2–725, the court in *Ontario Hydro* observed that to follow the more narrow definition of tender of delivery found in *Pullman* in the ordinary case would be to undermine the very purpose of § 2–725. As the court stated "[i] the court were to apply the phrase as the plaintiff suggests, then until the seller tenders conforming goods, the limitation period provided in § 2–725 would never apply. This would circumvent the very purpose of § 2–725 ... to provide a finite period in time when the seller knows that he is relieved from liability for a possible breach of contract for sale or breach of warranty." *Ontario Hydro, supra*, 569 F.Supp. at 1267. The court's observations are surely applicable here since § 42a–2–503 Comment 1 is identical to its U.C.C. counterpart.

The purpose of § 2–725 was not circumvented in *Pullman*, the *Ontario Hydro* court continued, "because of its unique factual situation." *Id.* Significantly, the court observed, "[t]he parties in *Pullman* had agreed to a thirty-day pre-inspection period for a small percentage of the total goods. It was clear from the contract that once the thirty day period expired and the subway cars were delivered, then the 'tender of delivery' occurred and the breach of warranty statute began to run." *id.* at 1267–68. As a result, the court concluded, the "clause in *Pullman* constituted a pre-delivery inspection." In contrast, the court in *Ontario Hydro* concluded that the terms of the contract before it contemplating inspection of the goods looked to post-delivery inspection. This distinction led to the *Ontario-Hydro* court's conclusion that application of the *Pullman* interpretation of "tender of delivery" would be inappropriate because to trigger the statute of limitations at the date of the post-delivery inspection would circumvent the purpose of § 2–725.

ute of limitations applicable to action for breach of warranty).

Following the lead of *Ontario-Hydro* in distinguishing *Pullman* and turning to the inspection provisions in the contract, it is clear that the contract contemplates a post-delivery inspection. Indeed, the relationship between installation and the acceptance testing here necessarily required the installation of the equipment. In *Pullman,* in contrast, the inspection test was to be conducted not only before the vast balance of the goods were delivered but it was designed to determine whether the balance of the goods should in fact be delivered. The plaintiff here could have used the equipment's failure of the Witnessed Test simulating operating conditions to terminate the contract *prior* to the installation of the equipment, but the plaintiff instead chose to waive the requirement of a successful completion of the Witnessed Test and condition its acceptance upon the satisfactory completion of the Acceptance Test, which took place *seven* years after the Witnessed Test and after complete installation of the equipment. As a result, any factual similarity between *Pullman* and the case at bar ended when the plaintiff waived the very contract provision that would most align this case to *Pullman.* The plaintiff's reliance on *Pullman* is thus unfounded. *See also City of Princeton, Illinois v. Transamerica Delaval, Inc.,* Civil No. 83–C–3155 (D.N.D.Ill.1985) [Available on WESTLAW, DCT database].

The result that *Pullman* is inapplicable here and that the tender of delivery date rather than the acceptance date controls, compels the conclusion that the plaintiff's theory cannot prevail because the suit was filed more than four years after the tender of delivery made on July 22, 1974, and on April 26, 1978. Moreover, the conclusion that the tender of delivery date controls also compels the conclusion that the first count's "failure to tender conforming goods" claim is time barred because "tender of delivery" is defined the same for this claim as it is for the breach of warranty based claims. *Ontario Hydro, supra,* 569 F.Supp. at 1267.

■ Blocked in its efforts to have the statute of limitations run from the date of acceptance rather than from the date of delivery, the plaintiff in its second argument attempts in two ways to fit its case within the "explicit warranty of future performance" exception of § 42a–2–725(2). The plaintiff's first theory is that the contract's requirement that acceptance be conditioned upon the successful completion of acceptance tests qualifies as an "explicit warranty of future performance" as that phrase is contemplated by § 42a–2–725(2). The problem with this argument, however, is that the undisputed absence of a specific time period in the alleged future performance guarantee runs afoul of settled law. "Most courts have been very harsh in determining whether a warranty explicitly extends to future performance. Emphasizing the word 'explicitly,' they have ruled that there must be a specific reference to a future time in the warranty." *Standard Alliance v. Black Clawson Co.,* 587 F.2d 813, 820 (6th Cir.1978) *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979) (citations omitted). *See also Sellon v. General Motors Corporation,* 571 F.Supp. 1094, 1098 (D.Del.1983) (cases cited therein). Moreover, the rare examples in which express warranties without specific dates have been held to extend explicitly to future performance do not appear applicable here, as the alleged guarantee of future performance here does not promise performance for "a lifetime." *Rempe v. General Electric Co.,* 28 Conn.Supp. 160, 254 A.2d 577 (1969), or at "all times." *Mittasch v. Seal Lock Burial Vault, Inc.,* 42 A.D.2d 573, 344 N.Y.S.2d 101 (1973). Indeed, to extend the defendant's liability where the contract does not explicitly detail a date through which performance is guaranteed would circumvent the very purpose of § 2–725(2), as "[t]he drafters of the UCC decided that the seller's need to have some clearly defined limit on the period of its potential liability outweighed the buyer's interest in an extended warranty and reserved the benefits of an extended warranty to those who explicitly bargain for them." *Raymond-Dravo-Langenfelder v.*

*Microdot, Inc.*, 425 F.Supp. 614, 618 (D.Del.1977).[3]

The plaintiff in its argument confuses the concepts of performance and the ability to discover the breach when it argues that only performance conditioned upon acceptance triggers the statute of limitations. The theory, apparently, is that the plaintiff was unable to discover the breach until the time of acceptance. This position, however, overlooks both the length of time prior to acceptance that the equipment was operating and the fact that the plaintiff indeed discovered a number of defects in the equipment prior to acceptance.[4] As a result, the qualifying requirement for the § 42a–2–725(2) exception that discovery of the breach must await the specified time of future performance is not met here.

The plaintiff's second argument relating to the applicability of the § 42a–2–725(2) exception is that the Section 1.14 eighteen month guarantee against defects in materials and workmanship at issue in count four qualifies for the exception and that this explicit guarantee of future performance extends as well to one, two and three because "the guarantee set forth in Section 1.14 incorporates the warranties [in counts one, two and three] and extends such warranties to the period set forth in the guarantee." Plaintiff's Memo In Opposition to Defendant's Motion for Summary Judgment, Filing No. 94, at 30–31. This is so, the argument runs, because "[a]s indicated in the City's Responses to Defendant's First Set of Interrogatories, No. 5(a), all of the equipment deficiencies alleged by the City constitute a result from defects in workmanship and materials, and they are all inextricably bound up with the ability of the equipment to perform in the manner

specified and its fitness for the purposes for which it was intended." *Id.* at 30.

This incorporation theory, however, cannot prevail for reasons beyond the absence of cited authority to support it. First, the warranty provision at issues makes no reference to the incorporation asserted by the plaintiff. The Section 1.14 equipment guarantee provides that

The Manufacturer shall guarantee all equipment furnished under this specification against defects in workmanship and material for a period of eighteen months (18) months from the date of acceptance of the equipment by the City.

All costs for labor and replacement parts to satisfactorily repair defective equipment shall be considered to have been included in the price bid for the equipment.

It is hereby, however, agreed that this guarantee shall not include any repairs made necessary by any cause or causes other than defective materials furnished by or defective workmanship performed by the Manufacturer.

A plain reading of this contract provision reveals that rather than extending the scope of the warranty as suggested by the plaintiff, Section 1.14 instead limits the guarantee to the repairs necessitated by defective material or workmanship. There is, as a result, no reason to believe that the warranty against defects in material and workmanship detailed in count four extends to performance guarantees found elsewhere in the contract.

Moreover, to extend the statute of limitations for the performance guarantees by the eighteen months of the guarantee against defects and workmanship would be inconsistent with the terms of each type of

---

3. *Rochester Welding Supply Corp. v. Burroughs Corporation*, 78 A.D.2d 983, 433 N.Y.S.2d 888, 889 (1980), relied upon heavily by the plaintiff, does not lead to a different result because there the court merely held that an express guarantee against defects for a period of years was unaffected by the four year statute of limitations of § 2–725(1). Indeed, for the court to have held otherwise would have rendered the express language meaningless. What the court did not hold was that an express guarantee against defects in materials and workmanship constituted an explicit warranty of future performance to

the extent that the buyer alleged the breach of such performance and sought damages beyond the limited remedy of replacement.

4. As noted by the defendant in its Memorandum in Support of its motion, the plaintiff admitted by way of interrogatory both that the equipment had been installed and operating as of June 29, 1984, and that it had notice of eleven of the 15 claimed defects before June 28, 1980. Defendant's Memorandum, Filing 89, at 13.

guarantee. The guarantee against defects in workmanship and material is clearly a repair guarantee that does not contemplate other remedies, while the performance guarantee claims made by the plaintiff look to remedies beyond repairs. To extend the life of the performance guarantees by way of the repair guarantee would confuse the remedies, would be a form of bootstrapping, and would greatly increase, without agreement, the seller's liability. In short, such a result would circumvent the very purpose of § 42a–2–725. In this sense, the plaintiff's response to an interrogatory that "all of the deficiencies alleged by the City constitute a result from defects in workmanship and materials" is insufficient to justify the extension of the defendant's liability. The plaintiff's remedy under count four is not at issue here and remains viable. Its viability, however, should not be confused with the viability of the remedies at issue in counts one, two and three.

In sum, the plaintiff's arguments relating to the contract counts must fail both because the suit was filed more than four years after the tender of delivery and because the § 42a–2–725(2) exception does not apply to counts one, two, and three. Accordingly, summary judgment on these counts should enter for the defendant. And because the warranty at issue in count four does not apply to counts one, two, and three, partial summary judgment on that count should enter for the defendant to reflect that conclusion. Count four is otherwise not affected by this granting of partial summary judgment.

*The Negligence Count*

In ¶ 57 the plaintiff alleges that "the centrifuge equipment provided by [the defendant] for the Mill Creek Plant was designed and constructed in a negligent manner." Both parties agree that the statute of limitations for this count is controlled by Conn.Gen.Stat. § 52–477, which states that "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

The defendant's argument on this issue, like its argument on the contract counts, is simple. Since all design and construction of the equipment occurred prior to the tender of delivery dates in 1974 and 1978, it contends, any claim would be time barred because any negligence on its part must have occurred prior to those dates.

Recognizing that its negligence count would otherwise be barred by the three year statute of limitations, the plaintiff argues that the continuing tort doctrine of *Handler v. Remington,* 144 Conn. 316, 130 A.2d 793 (1957), is applicable here. In *Handler,* an action involving a claim against a gun manufacturer for personal injuries sustained by use of an allegedly defective cartridge, the court held that "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute [of limitations] does not begin to run until that course of conduct is completed." *Id.* at 321, 130 A.2d 793. The plaintiff contends that here the defendant breached a continuing duty to design and construct by failing to offer or suggest to the plaintiff design modifications that it had already adopted internally to cure certain rotor rim wear problems with the centrifuges.

The plaintiff claims that certain facts are relevant to its negligence claim. First the contract required the defendant to exert extensive supervisory control over the initial operation of the equipment. The defendant was required to train certain personnel, to supervise the installation of the equipment, and to supervise the equipment's start-up operations. Second, the defendant knew "long before its equipment went on line at the Mill Creek Plant in 1980 ... of the serious wear problems that had been experienced by other municipal wastewater treatment plants using [the defendant's] centrifuges." This knowledge in fact led, the plaintiff continues, to the defendant's adaption of design changes to address the problem changes about which the plaintiff was not informed prior to acceptance testing. The defendant's proposed solution of "hardfacing" the equipment was ineffective, the plaintiff contends, and when it inquired in 1982 about design changes to solve the wear problem, the defendant said that it was making mod-

ifications but that such modifications were not ready for application to the plaintiff's plant. From all of this, the plaintiff asserts that the defendant's "actions were in total dereliction of its duty to [the plaintiff] to exercise due care in the provision of expert engineering services relating to such equipment." Plaintiff's Memo in Opposition, Filing No. 94, at 36.

Applying these facts to its statute of limitations argument, the plaintiff asserts that the defendant's "duty continued at least through November 1981, when the last of the centrifuge equipment supplied by [the defendant] was accepted by [the plaintiff] and its performance bond was released." *Id.* at 34. This breach of duty as of November 1981 makes the suit timely, the argument concludes.

There are significant problems, however, with the plaintiff's argument. First, its novel theory that the defendant had a continuing duty to design and construct is not supported by any authority. Second, this duty to design and construct is surely distinct from the *Handler* continuing duty to warn doctrine that qualifies as an act or omission continuing to the time of injury, which in turn would trigger the statute of limitations as an exception to § 52–577. *See Drakatos v. R.B. Denison, Inc.*, 493 F.Supp. 942, 945 n. 3 (D.Conn.1980) (Cabranes, J.), citing *Handler, supra.* If followed, the exception to § 52–577 advanced would swallow the rule. Moreover, the *Handler* doctrine relied upon by the plaintiff has been applied to personal injury torts and to the failure to warn of goods posing unreasonable risk of injury to those using them. *See, e.g., Ferguson v. Sturm, Ruger and Co.*, 524 F.Supp. 1042, 1045 (D.Conn.1981). This can hardly be said of the equipment at issue here. The court here sees no reason to extend the *Handler* doctrine as argued by the plaintiff.

The third and perhaps most significant reason the plaintiff's argument must fail is that the plaintiff in his complaint does not even allege the breach of a continuing duty to warn. Instead, it alleges only that "the centrifuge equipment provided by [the defendant] ... was designed and constructed in a negligent manner." Without an allegation that the defendant breached a continuing duty to warn, the plaintiff's recitation of facts relating to the attempts to deal with the excessive rotor wear problem thus becomes irrelevant.

The plaintiff's argument, in sum, must fail because the alleged breach of a continuing duty here does not fit within the *Handler* doctrine. As a result summary judgment should enter on the negligence count because it is barred by the applicable statute of limitations.

*Conclusion*

Summary judgment for the reasons set out above, should enter in counts one, two, three and five. Partial summary judgment should enter on count four as explained above.[5]

As provided by statute and Local Rules, the parties are entitled to seek timely review.

---

**5.** The plaintiff has moved to file a surreply brief. That motion is granted and the brief has been carefully considered. The court is of the opinion, however, that while admirably researched and written, the arguments advanced in the surreply brief do not compel a result contrary to the one reached here.