**ST. ANNE–NACKAWIC PULP COMPANY, LTD.,** Plaintiff,

v.

**RESEARCH–COTTRELL, INC., Defendant.**

**No. 90 Civ. 5369 (MBM).**

United States District Court, S.D. New York.

March 9, 1992.

Opinion on Motions for Reargument and Certification April 21, 1992.

Robert Braunschweig, Richard C. Raymond, Daniel R. Bright, Braunschweig Rachlis Fishman & Raymond, P.C., New York City, for plaintiff.

Alan Kanzer, Howard Bender, Walter, Conston, Alexander & Green, P.C., New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff claims that defendant breached a contract ("the Contract") to supply a pollution control system. Defendant now moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P. For the reasons set forth below, defendant's motion for summary judgment is denied.

### I.

Plaintiff, St. Anne–Nackawic Pulp Company, whose principal place of business is in New Brunswick, Canada (Compl. ¶ 2), produces wood pulp and related products. (*Id.* ¶ 5) Defendant, a New Jersey corporation, engineers, designs, manufactures, and installs air pollution products. (*Id.* ¶¶ 3, 6) In 1986, defendant purchased the assets of Teller Environmental Systems, Inc. ("TESI"), a company founded and managed by Dr. Aaron J. Teller ("Teller"). Teller is the inventor of numerous patented processes for pollution control. (Teller Aff. ¶¶ 3–12; Teller Dep. at 3, 6)

The subject of the Contract between plaintiff and TESI, as defendant's predecessor, is a system designed by TESI to limit the amount of Total Reduced Sulfur ("TRS") discharged as a by-product of the pulp making process. The principal objection to TRS is that it generates a strong sulphurous smell, rather like the odor of rotten eggs. Consequently, its discharge is regulated by New Brunswick environmental laws.

In 1980, "after the original Teller equipment was destroyed in a fire," plaintiff contacted TESI to "design new equipment." (Compl. ¶ 9) The new system was supposed to bring plaintiff's plant into compliance with New Brunswick regulations, which had been amended not long before to limit further the acceptable level of TRS discharge. Teller submitted a proposal dated January 26, 1981 for "the supply and installation of a Teller Crossflow Nucleation Scrubber and Roy–Lin Venturi with Expansion Joint and Supply only of Hydroclones." (*See* Raymond Aff.Ex. 2, Proposal at 1)

On February 25, 1981, the parties executed the Contract, which consists of (i) the written proposal dated January 26, 1981, and (ii) a copy of TESI's general contract terms ("general conditions"). The Contract price for the entire system, including equipment and services, was $2,065,000 (Canadian).

Section 7 of the Contract's general conditions is titled "Warranty." Section 7.1 contains a "Performance Warranty," which provides that seller's performance is complete once the system satisfies the performance specifications, including the promised TRS level, for a continuous three-day testing period to be conducted within 120 days of "start-up" but "in any event not later than nine (9) months after mechanical completion of the scrubber." (Id., Gen. Conditions at 4) The performance warranty further provides that: "In the event that the System fails to operate as stated above, Teller shall at its own expense, provide all engineering, drawings and specifications to modify the System as is necessary to make the System operate as warranted herein." (Id.) The Contract states that plaintiff will retain 10% of purchase price until TESI satisfies its obligations under the performance warranty. (Id., Proposal at 7) In addition to the performance warranty, the Contract also contains a "Warranty Regarding Engineering Services" for any "design error" discovered within one year of start-up (§ 7.2) and a "Warranty Regarding Equipment" (§ 7.3).

The system was completed mechanically[1] on September 22, 1982; start-up occurred[2] on December 16, 1982. (Initial Compl. ¶ 18) An independent consultant tested the system in March 1983, June 1983, and March 1984. Each time TRS emissions exceeded the 10 ppm level specified by the performance guarantee. From the first testing of the system in March 1983 until the time of this suit, the parties have attempted to determine the cause of, and a possible cure for, the system's failure. The parties agree that the system failed to achieve the promised emission levels although they dispute the cause of the failure.

On February 4, 1986, TESI and defendant entered into an asset purchase agreement under which defendant agreed to purchase the assets of TESI and assume certain of its obligations. Schedule 5.9.1 of the Asset Purchase Agreement listed the Contract as an "Open Contract" that was 98% complete and that had a $3,350 estimated completion cost. (Raymond Ex. 26) Section 5.9.1 of that agreement provides in relevant part:

> "Open Contract" means each agreement pursuant to which Seller is, or was, obligated to perform any service or provide any goods and Seller's performance is not complete, Seller has not received full payment, any warranty made by Seller has not expired or any claim or communication with respect to any warranty has been received by Seller.

(Raymond Aff.Ex. 25, 3425)

Following the sale, Teller became a consultant to defendant; he is now defendant's Vice President of Technology. (Teller Dep. at 67–68) On October 10, 1986, Teller wrote an internal memorandum captioned "Closeout of Teller Jobs." He described the Contract as follows: "After the last turnaround the system performance is significantly better than guarantee. It is expected that after official testing information is acquired, the contract can be closed out." (Raymond Ex. 29, at 3451)

On July 14, 1987, Teller wrote to plaintiff, stating that he had reviewed the latest data on the system (the system operating data and the test column data). He asserted:

---

**1.** The Contract defines "mechanical completion" as the date on which "the installation of equipment by Teller is completed and Teller has advised Owner [plaintiff] in writing that Owner may begin ducting, piping, and instrumentation (roof covers not affixed)." (Raymond Aff.Ex. 2, Gen. Conditions at 1)

**2.** The Contract defines "start-up" as "the date on which the installation is ready for commercial operation." (Id.)

We are prepared to meet with you to discuss the analysis of the data and work with you toward the apparent solution. Inasmuch as the system has exhibited oxygenation capacity to neutralize the high TRS inlets when in stable operation, we believe that the job should be closed out from a guarantee aspect.

However, as we have established in our relationship for these many years, we will continue to work with you toward the total solution to the operating problems.

(Raymond Ex. 30, at 0769)

On June 23–25, 1987, one of defendant's employees went to plaintiff in order "to work with St. Anne personnel and identifying [sic] the operation characteristics in the test column so that the result from this study may be applied to the main scrubber unit." (Raymond Ex. 31, at 0818)

On August 25, 1987, Teller again wrote plaintiff:

Since receipt of your letter we have received the verbal confirmation of the test column behavior reflecting our hypothesis of two years ago that carryover is related to foam instability.

Although we have worked together to achieve solution to the carryover problem, not present in the first unit, and will continue to work with you in the effective resolution of this problem, it is now established the cause was not the design. Therefore, it is essential that the holdback be released.

(Raymond Ex. 32)

On April 6, 1988, despite defendant's promise to work with plaintiff to find a solution to the problem, defendant wrote to plaintiff, asserting that the system's inability to achieve the required performance was "beyond [its] reasonable control." (Stephen Aff. ¶ 13 (viii); Raymond Ex. 33, at 0860) Nevertheless, defendant subsequently made additional proposals.

In September 1989, plaintiff wrote defendant, demanding that it " 'provide whatever modifications it deemed necessary to achieve' the guaranteed level of System performance. Receiving no satisfactory response to this letter, St. Anne filed suit against RCI in this Court [o]n October [24] 1989." (Pl.Mem. at 15 (quoting Stephen Aff. ¶ 13(xi)))

On November 8, 1989, plaintiff voluntarily dismissed this first action without prejudice, pursuant to a letter agreement signed by counsel. Under the letter agreement, the parties continued to negotiate in good faith to resolve the dispute. The letter agreement provided that any applicable statute of limitations would toll from October 26, 1989 until five days after defendant notified plaintiff that it no longer agreed to the suspension.

Continued discussions were not fruitful. At a meeting on August 1, 1990, defendant informed plaintiff than any future modifications of the Teller system would be made at plaintiff's sole expense and that defendant would take no further steps. On August 9, 1990, defendant informed plaintiff that it would no longer toll the statute of limitations. On August 17, 1990, plaintiff filed the complaint at hand. Alleging breach of contract, plaintiff seeks $12 million in damages. Essentially, plaintiff contends that the system's failure is caused by some design flaw; defendant contends the failure is due to differences between the actual and represented composition of pollution input into the system. Defendant argues also that plaintiff misrepresented details about the plant's operation throughout the period preceding this suit, thereby further frustrating defendant's efforts to design a workable system.

Initially, defendant moved to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P.; I converted that motion into a motion for summary judgment. Defendant now contends that it should be granted summary judgment because plaintiff's action is time barred. Defendant bases this contention on two principal arguments: (1) that the Contract is a contract for the sale of goods; and (2) that plaintiff's cause of action accrued no later than June 1983, when the system failed the second test. Plaintiff, on the other hand, contends that: (1) the Contract was a contract for the sale of services; and (2) its cause of action accrued when

defendant announced that it could not, and/or would not, conform the system to the Contract specifications.

## II.

Fed.R.Civ.P. 56(c) requires a summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

■ In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgement. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the nonmoving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual dis-

putes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

## III.

■ Defendant argues that the contract at issue is a contract for the sale of goods; plaintiff argues that it is a contract for services. The test for determining whether a "mixed" contract is for the sale of goods or services is straight-forward: "A contract is for 'services' rather than 'sale' when 'service predominates' and the sale of items is 'incidental'.... While certain services ... [may be] contemplated, the contract remains one for sale if those services were 'merely incidental or collateral to the sale of goods....'" *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742–43 (2d Cir.1979) (citations omitted). In *Triangle Underwriters*, the Second Circuit found that a contract for sophisticated computer equipment, designed specifically for the purchaser, was a contract for the sale of goods even though the contract also covered related services. In reaching this determination, the court relied on three factors. First, "The contract declares itself unequivocally to be an 'Agreement for the Sale of Data Processing Equipment.'" *Id.* at 743. Second, as the district court had found, the agreement indicated that defendant did "'not contemplate that it would run a data processing service for Triangle but rather that Honeywell would develop a completed system and deliver it "turn-key" to Triangle to operate. After the installation and training period, Honeywell personnel were to withdraw, and Honeywell's major remaining obligation was to be maintenance.'" *Id.* (quoting *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F.Supp. 765, 769 (E.D.N.Y.1978)). Third, defendant's "compensation was limited to the purchase price for the hardware; it did not bill for services prior, during or subsequent to installation." *Id.*

■ *Triangle Underwriters* shows that the contract at issue is one for the sale of goods. First, TESI's proposal is titled "Proposal for the Supply and Installation of a Teller Crossflow Nucleation Scrubber

and Roy–Lin Venturi with Expansion Joint and Supply only of Hydroclones...." (Raymond Aff.Ex. 2, Proposal at 1) This title indicates that plaintiff was acquiring a pollution control system and not air-cleaning services.

Second, the Contract provides for start-up services of limited duration. Moreover, if plaintiff wanted additional assistance, the Contract required it to pay TESI at "the then current per diem rate for Teller personnel." (*Id.*, Proposal at 6) Therefore, the Contract shows that the parties contemplated that TESI would get the system up and running and then plaintiff, without TESI's assistance, would operate it.

Third, although some of the total purchase price appears to have been allocated to services, it is a relatively small percentage. An internal TESI budget report prepared by Teller shows that TESI allocated $1,319,634 (Canadian), or 64% of the total purchase price, to "external costs," which are defined as "costs for equipment purchased from others." (Teller Aff.Ex. 2) By comparison, the budget allocates $283,832 (Canadian), or 14% of the total contract price, to "internal costs," which consist primarily of engineering services performed by Teller. (*Id.*) The remaining 22% was divided between contingency/risk reserves (4%) and profit (18%). (*Id.*) Therefore, although this is a "mixed" contract under which some services were rendered and some of the purchase price was allocated to those services, the primary purpose of the Contract was to allow plaintiff to acquire a pollution control system and any services were incidental to that primary purpose. Moreover, the sophisticated and customized nature of the equipment does not make it any less a good. *See Triangle Underwriters*, 604 F.2d at 743 (concluding that computer system containing custom soft-ware was governed by U.C.C. Article Two); N.Y.U.C.C. § 2–105(1) (McKinney 1964) (defining "goods" as "including specially manufactured goods"); *see also Kline Iron & Steel, Co. v. Gray Communications Consultants, Inc.*, 715 F.Supp. 135, 140 & n. 3 (D.S.C.1989) (contract for construction of

television tower) (summarizing cases involving both goods and services).

IV.

Because the Contract is primarily a contract for the sale of goods, it is governed by Article Two of the Uniform Commercial Code. Under Article Two, the applicable statute of limitations for transactions in goods provides:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where the warranty explicitly extends to future performance of the goods and discovery must wait the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.Y.U.C.C. § 2–725.

Plaintiff alleges that defendant breached the Contract by failing to satisfy the performance warranty. Therefore, whether this action is time barred depends on the date on which defendant tendered delivery of the system. "Tender of delivery" occurs when the seller puts "conforming goods at the buyer's disposition." N.Y.U.C.C. § 2–503(1). Tender of delivery is further defined as "such performance by the tendering party as puts the other party in default if he fails to proceed in some manner." Official Comment to N.Y.U.C.C. § 2–503. Although tender of delivery usually occurs when the seller physically delivers the goods, parties may alter by contract how or when tender of delivery occurs. In *City of New York v. Pullman, Inc.*, 662 F.2d 910 (2d Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), the Second Circuit addressed the question of tender of delivery under a contract that provided for testing of the goods. The contract, for the sale of 754 subway cars, provided that prior to acceptance of the cars, the buyer would be

permitted to test 10 of the cars for 30 days. In addition, the contract did not obligate the buyer "to take any steps until [the seller] conformed to the specifications by delivering cars which had completed the 30 day test...." *Id.* Therefore, the court determined that "[u]ntil that inspection occurred ... there could be no tender of 'conforming goods' within the meaning of § 2–503(1)." *Id.* at 919.

Defendant would distinguish *Pullman* on two grounds. First, defendant notes that *Pullman* also contains language indicating that tender of delivery of nonconforming goods starts the statute of limitations running. *See id.* ("[T]he statute of limitations for the breach of warranty begins to run when the seller tenders delivery of defective goods...."). This argument, however, misconstrues *Pullman*'s relevance to the case at hand. In *Pullman*, the goods were neither conforming nor nonconforming until the cars had been tested because the contract "specifically provided that any cars built before the 30 day test had been completed were constructed at the seller's risk." *Id.* Similarly, in the case at hand, the system was neither conforming nor non-conforming until it had been tested and, if necessary, defendant either had corrected it or repudiated its obligation to correct it. Until the system was non-conforming, there could be no breach of the performance warranty.

Second, defendant would distinguish *Pullman* by arguing that *Pullman* held only that, under a contract that provides for pre-delivery testing, testing does not constitute tender of delivery; whereas, under a contract that provides for post-delivery testing, physical delivery triggers the statute of limitations. (Def.Rep.Mem. at 5) However, as *Cincinnati v. Dorr–Oliver, Inc.*, 659 F.Supp. 259 (D.Conn.1986), illustrates, albeit in a holding I decline to follow, defendant's conclusion merely begs the question, which is when the parties intended delivery to occur. *Dorr–Oliver* addressed facts that are substantially similar to the ones at hand. The contract in question was for the sale of 16 centrifuges for the thickening of excess activated sludge at plaintiff's wastewater treatment plant. It provided for both pre-shipment and post-shipment testing. If the equipment failed the pre-shipment test three times, plaintiff (buyer) had the option of cancelling the contract, or accepting the equipment on the condition that the equipment pass the post-shipment test, "the acceptance test." The acceptance test was to be performed after all the equipment was installed and operating at plaintiff's plant for at least four weeks and after the parties mutually agreed the equipment was in suitable condition for continuous operation. If the equipment failed to conform to the contract specifications after three tries: (1) plaintiff could allow defendant additional time to replace or modify the equipment; (2) plaintiff could accept the equipment at a reduced price; (3) plaintiff could recover the contract price less the value of its use of the equipment; or (4) plaintiff could accept the equipment conditioned upon additional provisions negotiated by the parties. *Id.* at 260. The acceptance test was performed and "plaintiff declared that the defendant's contractual obligations had been fulfilled and released the defendant's performance bond." *Id.* at 261. Problems with the equipment arose and continued until the equipment ultimately was shut down. Plaintiff sued for breach of contract; defendant moved for summary judgment on the basis that the action was time-barred.

In response to plaintiff's argument that delivery did not occur until it had accepted the equipment, the court found that the contract contemplated a post-delivery inspection. Because the court determined that *Pullman* stands only for the narrow proposition that pre-delivery testing does not trigger the statute of limitations, it found that *Pullman* was inapposite. *See id.* at 263. In *Pullman*, "the inspection test was to be conducted not only before the vast balance of the goods were delivered but it was designed to determine whether the balance of the goods should in fact be delivered." *Id.* at 264. By contrast, the court found that "the relationship between installation and the acceptance testing here necessarily required the instal-

lation of the equipment." *Id.* at 264. In addition, the court noted that " 'Whether or not the buyer at that time "accepts" the goods, as that term is used in the Code, or, on the other hand, withholds acceptance until he or she has had an opportunity to fully inspect for defects, does not affect when the buyer must institute suit for breach of warranty.' " *Id.* at 262 (quoting *Raymond–Dravo–Langenfelder v. Microdot, Inc.*, 425 F.Supp. 614, 617 (D.Del. 1977)).

▆▆▆ Although delivery of nonconforming goods can constitute tender of delivery, *see, e.g., H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 455 (2d Cir.1991), and although the buyer need not accept the goods in order to start the statute of limitations running, and although the buyer need not be aware of the breach in order to start the statute of limitations running, *see* N.Y.U.C.C. § 2–725, *Dorr–Oliver*'s result is still illogical. Under the *Dorr–Oliver* contract, the goods became non-conforming only at the time of the acceptance test. However, *Dorr–Oliver* found that the statute of limitations began to run before the goods became non-conforming because it placed undue emphasis on the date of physical delivery rather than on the terms of the specific contract before it. This caused the court to reach the perverse conclusion that the statute of limitations began to run before the breach occurred. Moreover, this conclusion is contrary to the express language of N.Y.U.C.C. § 2–725, which states that a cause of action accrues when the breach occurs. *See* N.Y.U.C.C. § 2–725; *cf. Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (holding that when literal meaning of statute renders "unfathomable" result or "bizarre disposition," statute should not be read literally); *Northpark Nat'l Bank v. Bankers Trust Co.*, 572 F.Supp. 524, 530 (S.D.N.Y.1983) (noting that commercial practicality is virtue of UCC). Therefore, I decline to apply *Dorr–Oliver*.

Defendant also seeks to rely on *Triangle Underwriters, supra,* to establish that physical delivery constitutes tender of delivery even when post-delivery testing is done and corrections are made. However, in *Triangle Underwriters,* the contract contemplated a turn-key computer system. *See* 604 F.2d at 741. "But the 'delivery' gave immediate cause for concern," *id.* at 740, and it was apparent upon installation that the system did not work as expected. Defendant attempted for over a year to fix the computer system, and perhaps even for as long as two years. *See id.* Therefore, in *Triangle Underwriters,* the performance warranty was breached the moment the computer was plugged in. *See id.* at 742 ("the breach occurred when the system was installed and immediately proved itself incapable"). In the case at hand, however, neither party expected the system to work upon mechanical completion. As plaintiff states:

> The parties never contemplated that the Teller system would be a "turn-key" project that would be ready to operate properly upon its initial installation. The System required a lengthy implementation period before it was expected achieve its guaranteed performance. Indeed, the Contract provides that before the System was even to be tested there would be an extended running period.

(Pl.R. 3(g) Statement ¶ 10) Therefore, *Triangle Underwriters* is inapposite.

Under the terms of the Contract, TESI did not tender delivery when it mechanically completed, nor when it installed, the system. This conclusion is compelled by one essential fact: plaintiff could not have sued for breach of contract while TESI, and later defendant, was still performing under the Contract. TESI/defendant could not have breached the Contract while it was still fulfilling the performance warranty, which does not place a time limit on defendant's obligation to correct the system. So long as TESI/defendant had not yet breached, plaintiff could not have sued. Therefore, it would be irrational to conclude that the statute of limitations began to run while TESI was still performing.

▆▆▆ Moreover, the parties contemplated that there would be an extended installation period during which the system was being worked on by defendant. Therefore,

tender of delivery did not occur until TESI/defendant either had satisfied the performance warranty or repudiated its obligation to satisfy the performance warranty. Before then, the system could not even have been termed nonconforming because it was not yet expected to conform to the Contract specifications.

■ From the affidavits and exhibits, it appears that, if defendant breached the performance warranty, it breached it sometime between October 10, 1986—the date of Teller's internal memo—and July 14, 1987—the date of defendant's letter to plaintiff stating that it believed the Contract should be closed out "from a guarantee aspect." Certainly, defendant's July 14, 1987 letter made it clear that defendant would not satisfy the performance warranty as a contractual obligation. However, even applying the estimate most favorable to defendant, which would start the statute of limitations running on October 10, 1986, plaintiff had until October 10, 1990 to commence this suit. Because plaintiff initially filed suit on October 24, 1989, its action appears not to be time barred.

However, defendant now contends that the reason it strove "for over seven years to make the Scrubber work to St. Anne's satisfaction is [its] belief that is simply good business to keep a customer happy." (Teller Rep.Aff. ¶ 59; *see also* Def.Rep. Mem. at 6 (stating that "defendant never admitted that the Scrubber did not operate properly or that defendant was responsible for any deficiencies in its performance")). To support this contention, defendant claims that "[w]henever we asked for payment [of the holdback], we were told we would not get it until the performance tests were met." (Teller Rep.Aff. ¶ 61) In addition, defendant maintains that the Contract was listed as an open contract on the Asset Purchase Agreement because the Agreement defined "the term 'Open Contract' to include 'each agreement pursuant to which Seller [TESI] ... has not received full payment....'" (Def.Rep. Mem. at 6) And, according to Schedule 5.9.1, plaintiff owed $64,815 on the Con-

tract as of February 1986. (Teller Rep.Aff. ¶ 4)

Although Teller's internal memorandum of October 10, 1986, and defendant's July 14, 1987 letter weaken defendant's contention that it was attempting to correct the system in order to maintain good client relations, this contention nonetheless raises a material issue of fact as to the date of the alleged breach.

For the above reasons, defendant's motion for summary judgment is denied.

SO ORDERED.

### OPINION ON MOTIONS FOR REARGUMENT AND CERTIFICATION

On March 9, 1991, I issued an opinion and order ("the March 9 opinion") (see page 729) denying defendant's motion for summary judgment. Defendant now moves for reargument of the March 9 opinion pursuant to Local Civil Rule 3(j), or for certification pursuant to 28 U.S.C. § 1292(b). The facts relevant to defendant's summary judgment motion are set out in detail in the March 9 opinion, familiarity with which is assumed for current purposes. For the reasons set forth below, defendant's motion for reargument is denied; defendant's motion for certification is granted.

I.

Defendant claims that reargument is appropriate because the March 9 opinion: (1) failed to follow the pre-delivery versus post-delivery testing distinction set out by *New York v. Pullman, Inc.*, 662 F.2d 910 (2d Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), and *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450 (2d Cir.1991); and (2) failed to distinguish between a warranty and a remedy. (Def.Mem. at 1)

First, defendant's claim regarding the pre-delivery versus post-delivery testing distinction raises nothing that was not addressed fully in the March 9 opinion. Nonetheless, defendant argues that the March 9 opinion did not consider *H. Sand*. However, *H. Sand* held only that a materi-

al issue of fact remained in that case as to when the seller meant to tender delivery. For purposes of the *H. Sand* contract, the court construed tender of delivery to mean the date when the seller intended to put the goods at the buyer's disposition. *See* 934 F.2d at 455.

Defendant relies on *dictum* in *H. Sand* that cites *Cincinnati v. Dorr–Oliver, Inc.*, 659 F.Supp. 259 (D.Conn.1986), and *Raymond–Dravo–Langenfelder v. Microdot, Inc.*, 425 F.Supp. 614, 617 (D.Del.1976), as establishing that "where a contract simply provides for delivery to be followed by testing, the pre-testing delivery constitutes 'tender of delivery' within the meaning of N.Y.U.C.C. § 2–725(2)." 934 F.2d at 455. However, this *dictum* does not resolve the question at hand—namely, when tender of delivery occurs under a contract that provides for post-physical delivery adjustment of the goods without which the goods are useless to the buyer. Nor does *H. Sand* suggest that tender of delivery occurs when the goods are physically delivered to the buyer *regardless* of any express terms contained in the contract to the contrary. Moreover, the *H. Sand dictum* cited by defendant is not the type of *dictum* intended to provide guidance to lower courts; *H. Sand* does nothing more than distinguish the cases cited by defendant from the question there, which was when the parties intended the seller to put the goods at the buyer's disposition. *Cf. United States v. Oshatz*, 912 F.2d 534, 540–41 (2d Cir.1990) (finding that government and lower court should have followed *dictum* in prior opinion specifically stating that certain types of questions "should not be asked" in a criminal proceeding), *cert. denied*, — U.S. —, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991).

In addition, neither of the two cases cited by *H. Sand* in support of the pre-delivery/post-delivery testing distinction logically determines the result in the case at hand. For reasons set out fully in the March 9 opinion, I decline to follow *Dorr–Oliver*, which would compel an absurd result in this case: the statute of limitations would start to run before a breach had occurred and before plaintiff could sue. Moreover, *Microdot* is inapposite here. In *Microdot*, the court rejected the buyer's argument that its action was not time-barred because the buyer had "reserved the right to conduct later inspections and to reject the goods if they did not conform to the specifications of the contract." 425 F.Supp. at 617. The *Microdot* court correctly found that the statute of limitations began to run when the goods in question were physically delivered because U.C.C. § 2–725 barred a holding that the statute of limitations did not begin to run until the buyer accepted the goods. *Microdot*, therefore, stands for the principle that an inspection provision cannot be used to circumvent § 2–275's provision that the statute of limitations begins to run regardless of the buyer's knowledge of a breach of warranty.

However, in the case at hand, plaintiff is not claiming that the statute of limitations did not begin to run until plaintiff had inspected or had accepted the system. Rather, plaintiff is claiming that the statute of limitations did not begin to run until a breach had occurred. By the express terms of the Contract, there was no breach until TESI/defendant either had satisfied the performance warranty or repudiated its obligation to satisfy the performance warranty. Before then, the system could not have been termed non-conforming because it was not yet expected to conform to the Contract specifications.

■ Second, defendant's claim that the warranty provisions of the Contract were remedial is a contrivance. In its memoranda and documents in support of the summary judgment motion, defendant contended that the reason it (and TESI before it) strove "for over seven years to make the Scrubber work to St. Anne's satisfaction is [its] belief that it is simply good business to keep a customer happy." (Teller Rep.Aff. ¶ 59; *see also* Def.Rep.Mem. at 6 (stating that "defendant never admitted that the Scrubber did not operate properly or that defendant was responsible for any deficiencies in its performance"); Teller Rep.Aff. ¶ 61) Defendant now reverses field and argues that the warranty provision of the Contract placed on defendant/TESI an obli-

gation to correct the system if that was the remedy plaintiff chose to pursue. This groping, improvisational reading of the Contract itself betrays a weak argument.

Moreover, defendant's newly minted claim regarding the remedial nature of the performance warranty ignores that the Contract had not yet been breached at the time the system was installed. The Contract contains terms written with the obvious assumption that the system would not meet the Contract's performance specifications at the time of installation; those terms would be made meaningless if I were to find that the system's failure to meet performance specifications at the time of installation rendered the system non-conforming. When the system failed to meet the Contract specifications during the first two official tests, the parties continued to perform as the Contract anticipated they would: *i.e.*, defendant/TESI continued to attempt to bring the system into conformity. So long as defendant/TESI attempted to correct the system, and neither party asserted that these efforts were anything but in conformity with contract requirements, there had been no breach requiring a remedy.

## II.

Section 1292(b) of Title 28 permits an immediate appeal when an interlocutory order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal ... may materially advance the ultimate termination of the litigation."

In the case at hand, a controlling question of law is presented by whether installation of the system, as the Contract defined that event, was sufficient, without more, to trigger the statute of limitations. Moreover, deciding this question in defendant's favor would terminate the underlying suit. Second, although I find *Dorr–Oliver* to compel an illogical result, it does support defendant's claim that the statute of limitations began to run when the system was installed. Therefore, defendant has satisfied the criteria for certification

pursuant to § 1292(b). Accordingly, defendant's motion for certification is granted.

SO ORDERED.