**GLADSTONE FORD, Plaintiff–Appellant,**

v.

**NEW YORK CITY TRANSIT AUTHOR-ITY, and Manhattan and Bronx Surface Transit Operating Authority, Defendants–Appellees.**

**Docket No. 01–9091.**

United States Court of Appeals, Second Circuit.

Aug. 21, 2002.

Gladstone Ford, pro se, Brooklyn, NY, for Plaintiff–Appellant.

Barbara M. Roth, Torys LLP, New York, NY, for Defendants–Appellees.

Present CALABRESI, POOLER and SACK, Circuit Judges.

## SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be and it hereby is **AFFIRMED**.

Plaintiff–Appellant Gladstone Ford appeals from an entry of summary judgment by the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., *Judge*) on Ford's Title VII race discrimination and retaliation claims, which arise under 42 U.S.C. § 2000e.[1]

## BACKGROUND

Gladstone Ford's ("Plaintiff") claims grow out of various purported incidents of race discrimination during the course of his employment with the Manhattan and Bronx Surface Transit Operating Authority (MABSTOA), a statutory subsidiary of the New York City Transit Authority (N.Y.CTA) ("Defendants"). Plaintiff, an attorney admitted to the District of Columbia bar, was hired in March 1989 by MABSTOA, as Manager of Labor Relations for the Staten Island Division, Department of Buses. His duties included handling grievance appeals and arbitrations, and otherwise administering labor relations and labor contracts for the Staten Island Division. On the record before us, his performance was judged to be middling from the start, and spiraled downward from mid–1991 to 1994. During the same period, he applied for numerous high-level positions, but was offered none of them. Ford took leave for medical reasons on March 25, 1994, and never returned to work. A year later, MABSTOA notified Ford that, pursuant to MABSTOA policy, he would lose his position if he failed to return. He was subsequently terminated effective May 23, 1995.

*Plaintiff's Performance Evaluations*

Plaintiff's first MABSTOA performance evaluation, covering March 27, 1989 to March 27, 1990, rated him as "fully satisfactory," the second-to-lowest category on a four-point scale. The next year, under new supervisors, George Governale and Frederick L. Herman, Plaintiff again received a "fully satisfactory," now the third rung out of five on a revised ratings scale. Governale and Herman remained Plaintiff's supervisors for most of the period under dispute. In 1992, Plaintiff received another "fully satisfactory," but was cited for "marginal" organization, planning, and leadership abilities. This echoed earlier comments from Prendergast about Plaintiff's lack of initiative. Plaintiff's 1992 evaluation also referenced an irate internal memo accusing Plaintiff of blatantly undermining his client (Staten Island bus management) during an arbitration proceeding. This was one of many memos from colleagues and clients that, starting in June of 1991 and continuing for the balance of Plaintiff's tenure, registered assorted complaints about Plaintiff's performance: missed meetings and arbitrations, failures to submit documents on time, submission of incomplete documents, inappropriate demeanor, inattention to facts, and more. Plaintiff's March, 1993 review downgraded him to "poor," the lowest possible rating, noting among other things some of these complaints. His final review, in March,

---

1. Ford also brought claims under the Equal Pay Act, 29 U.S.C. § 206(d), and state and local law. The district court granted summary judgment to the defendants on the Equal Pay Act charge and, having dismissed all of the federal causes of action, declined to hear the state and local claims.

1994, also graded him "poor," and recommended his removal.

*Plaintiff's Efforts to Secure Promotion*

In 1991, Plaintiff started applying for senior positions within MABSTOA and NYCTA. Postings for many of these jobs required candidates to have years of management and/or specialized mass-transit experience. Though worldly and well educated, Plaintiff lacked the relevant years of learning-by-doing mandated in the postings.

Plaintiff's first target, in March of 1991, was the position of Assistant General Manager, Administration, Staten Island Division, which position was eliminated without being filled. On July 8, 1991, he put in his name for Chief Electrical Officer, the official in charge of all aspects of the signal, power distribution, and communication system for NYCTA's subways. The position was filled by a high-level manager from the Car Equipment Division, who previously oversaw maintenance and repair of the NYCTA's entire fleet of subway cars. On April 7, 1992, Plaintiff applied to be Senior Director, Labor Research and Negotiations, a position that went unfilled until 1995, some time after Plaintiff had stopped working. Not two months later, on May 28, Plaintiff entered his resume for the position of Labor Counsel with the Metropolitan Transportation Authority, an entity whose personnel practices are unconnected to the Defendants'. Plaintiff's complaint states that he applied on September 14, 1992 to be Director, Surface Transit (Pl. Complaint ¶ 31). On October 20, 1992, Plaintiff sought the position of General Manager, Bronx division, with budget responsibilities of $200 million and oversight of depots responsible for 1000 buses. The position was filled by an applicant who came from a similar position where he managed hundreds of buses, thousands of employees, and budgets in the hundred millions. On May 10, 1993, Plaintiff applied to be Assistant General Manager, Staten Island Rapid Transit Operating Authority, a subsidiary of MTA. The position was eliminated due to corporate reorganization before being filled. Later that summer, Plaintiff tried for the position of General Manager, Surface Transit, Staten Island, but he had nowhere near the number of years of transport-industry and management experience stipulated for the job.

Early in 1994, Plaintiff sought to become Director, Labor Relations for Brooklyn. For Plaintiff, this position would have been a lateral transfer to a larger borough. The chosen applicant was a black woman who, unlike Plaintiff, was licensed to practice law in New York. This was the last of Plaintiff's applications, for on March 25, 1994, claiming job-related stress, Plaintiff took leave from work and did not return.

*Plaintiff's Employment Discrimination Complaints*

On March 20, 1992, Plaintiff registered charges against his supervisor, George Governale, with the internal Affirmative Action/Equal Employment Opportunity Office ("EEO") that served MABSTOA and NYCTA employees. Plaintiff complained that on account of race and color, Governale gave him low performance ratings, denied him promotions and raises, and generally prevented him from getting the high-level positions he had sought. On January 11, 1993, the EEO reported that its investigation uncovered no evidence of the alleged discrimination. A month later, on February 9, Plaintiff filed the first of two charges with the federal Equal Employment Opportunity Commission (EEOC) against NYCTA. He claimed that he had always received "good" evaluations until a "new" manager was assigned to him, whereupon his evaluations plum-

meted and so too his prospects for raises and promotion.

The next EEOC filing came on April 14, 1994, nearly a month after Plaintiff had stopped working. Here again he claimed that on account of race he had been denied promotions and suffered poor evaluations, and to this he added that he had recently been threatened with "demotion and/or termination." On July 6, 1995, soon after his firing, Plaintiff amended his first EEOC complaint, positing race and retaliation as the reasons for his termination.

*The Instant Lawsuit*

The EEOC dismissed Plaintiff's charges on April 20, 1998, and he began the present action on July 16 of that year.

Two years into the proceedings, on June 9, 2000, the district court issued an order at the parties' behest revising the briefing schedule on Defendants' motion for summary judgment. This was the second extension granted, and the court stated that it would be the last. Under the new and final schedule, Defendants were to serve their motion for summary judgment by June 28, 2000, Plaintiff was to submit his papers in opposition by August 14, 2000, and Defendants were to file their reply by September 11, 2000. Defendants were punctual, serving their papers on June 28. Plaintiff was not, and on August 23, nine days after his papers were due, he sought the extension the court had warned would not be given. The district court denied the motion, on grounds of (1) its previous, explicit order, and (2) the tardiness of Plaintiff's application. Plaintiff thereupon submitted his opposition papers on August 29, fifteen days late, and they were, seemingly, accepted. Despite losing a full two weeks to Plaintiff's protraction, Defendants turned in their reply memo by the appointed date, September 11, 2000. In this reply, Defendants observed that Plaintiff had submitted neither admissible evidence or affidavits in opposition to Defendants' motion, nor a proper statement of facts, as required by Local Civil Rule 56.1. They noted that Plaintiff was obliged to "identify all alleged genuine issues of material fact to be tried, each of which 'must be followed by citation to evidence which would be admissible.'" Reply Mem. of Law in Supp. of Defs.' Mot. for Summ. J., at 3. The purported 56.1 Statement, Defendants added, featured "not a single citation to anything." *Id.*

On September 21, ten days after Defendants had served their reply and four weeks after Plaintiff had filed his opposition papers, Plaintiff sought leave of the court to supplement his papers with a "small amount" of legal argument plus some "inadvertently" omitted exhibits. Letter from Thomas F. Bello to the Hon. Sterling Johnson, Jr., Sept. 21, 2000, at 1. Plaintiff justified the request with reference to "misunderstandings among counsel" about possible extensions beyond the August 14 deadline for Plaintiff's opposition papers. *Id.* Defendants responded that such supplementation would "seriously" prejudice their case, as they had already served their reply papers. Letter from Barbara Roth to the Hon. Sterling Johnson, Jr., Sept. 25, 2000, at 2. The district court denied Plaintiff's request.

Throughout all this time, Plaintiff, who is in any event an attorney, was counseled.

On May 31, 2001, the district court granted the Defendants' motion for summary judgment. This appeal followed.

On appeal, Plaintiff argues first that the district court abused its discretion (1) in relying on certain affidavits from Frederick L. Herman, Plaintiff's erstwhile supervisor, and Barbara Roth, Defendants' attorney; (2) in allowing Defendants to use an unsigned copy of Plaintiff's deposition transcript; and (3) in barring Plaintiff

from belatedly supplementing his papers in opposition to Defendants' motion for summary judgment. More broadly, Plaintiff contends that the district court mistakenly granted summary judgment to Defendants on Plaintiff's Title VII race discrimination and retaliation charges.

## DISCUSSION

We review a district court's decisions respecting extensions of time in procedural matters for abuse of discretion, *Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir.1984) (addressing Fed.R.Civ.P. 6(b)(2)), which is "one of the most deferential standards of review." *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir.2001) (citation and internal quotation marks omitted).

A district court's grant of summary judgment we review *de novo*, with all evidence construed in the light most favorable to the nonmoving party. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir.2002). Summary judgment is in order, however, where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (citation and internal quotation marks omitted).

■ We consider first the court's refusal to allow Plaintiff to supplement his opposition papers. Fed.R.Civ.P. 6 governs extensions of time in relation to court orders. In relevant part, it provides that a court may "upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." Fed.R.Civ.P. 6(b)(2). "[W]hether neglect is excusable in a particular case rests with the sound discretion of the district court." *Davidson*, 740 F.2d at 132 (citation and

internal quotation marks omitted). In *Davidson*, because the nonmoving party failed to seek an extension prior to the motion return date, we sustained a trial judge's decision to exclude from consideration opposition papers to a motion to dismiss. *Id.* Though the appellants had proffered a plausible excuse—not being able to locate essential nonparty witnesses before the return date—we pointed out that this fact "does not explain why appellants failed to *request* additional time prior to" the court-set date. *Id.* at 132.

In the instant case, the first post-deadline extension was sought on the ground that Plaintiff's lawyer had been busy with another trial and deposition, i.e., the quotidian practice of law. Moreover, as in *Davidson*, nothing in the nature of the attorney's "excuse" prevented him from seeking a pre-deadline extension. Having submitted his opposition papers two weeks late, having benefitted from a de-facto extension, having reduced by half Defendants' time to file their reply, Plaintiff had no tenable basis for seeking leave to file a surreply, at least where the proffered excuse had nothing to do with anything new in Defendants' reply papers. The district court's denial of that leave lay well within its discretion.

Plaintiff tries to end-run the consequences of his omissions below by asking us to consider afresh whether the affidavits submitted with Defendants' motion for summary judgment were proper, and whether Defendants wrongly put into the record an unsigned copy of Plaintiff's deposition. Plaintiff had his chance to raise these questions in his opposition papers and did not do so.[2] We decline to permit him to raise them at this late date. *See H. Sand & Co., Inc. v. Airtemp Corp.*, 934

---

**2.** Plaintiff not only failed to do so, he tacitly accepted the unsigned deposition by repeatedly citing it in his opposition. *See* Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., at 4,5,6,7,8.

F.2d 450, 455 (2d Cir.1991) (treating as waived on appeal plaintiff's newfound objections to affidavits submitted with the defendants' motion to dismiss), *In re Teltronics Servs., Inc.*, 762 F.2d 185, 192 (2d Cir.1985) ("[Appellant] waived any objection to the affidavit by failing to move to strike it."); *cf. Van Praag v. Columbia Classics Corp.*, 849 F.2d 1106, 1110 (8th Cir.1988) (holding that trial judge did not err in allowing use of unsigned depositions, where the objecting party had copies of the depositions and notice of the other party's intention to use them).

■ Plaintiff's Title VII retaliation and discrimination claims center on the nine occasions, described above, on which he applied for but did not receive high-level positions.[3] He claims also that his firing was in retaliation for his EEOC complaints. He did not, however, in his opposition papers, as required under Local Rule 56.1, traverse Defendants' explanation for these events. Under the circumstances, the district court correctly granted summary judgment. Even assuming, arguendo, that Plaintiff made out a prima facie case, he did not, as required, present evidence sufficient to permit a jury to find that Defendants' explanations were pretextual. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000) ("The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.") (citation and internal quotation marks omitted).

We have considered Plaintiff's remaining arguments and adjudge them meritless. Accordingly, the trial court's ruling is AFFIRMED.[4]

---

3. The sum total of Plaintiff's applications for promotions is slightly uncertain. Plaintiff's brief claims that he applied for "at least ten," but does not corroborate this number. Appellant's Br. at 2. Defendants and the trial court identify nine applications, which are the ones we consider here.

4. Our resolution of the Title VII claims renders moot Defendants' argument that we should dismiss the instant appeal due to the alleged noncompliance of Plaintiff's brief with the Federal Rules of Appellate Procedure.